**In re DESERT ENTERPRISES, d/b/a Oak Tree Apartments, Debtor.**

**Bankruptcy No. BK–S–87–00433–RCJ.**

United States Bankruptcy Court, D. Nevada.

May 9, 1988.

Timothy S. Cory, Las Vegas, Nev., for debtor.

Kelly H. Schofield, Miles, Pico & Mitchell, Las Vegas, Nev., for First Western Sav.

## MEMORANDUM DECISION

ROBERT CLIVE JONES, Chief Judge.

The Debtor, Desert Enterprises ("Debtor"), objects to the claim of secured creditor First Western Savings ("First Western"). For the reasons set forth below, the objection is overruled and the claim will be allowed.

## FACTS

On April 18, 1977, Robert Bigelow and Robert Banks borrowed $500,000 from American Savings & Loan Association ("ASL"). They executed a note in favor of ASL in the amount of $500,000 bearing interest at 10% per annum for twenty-five years. The payments required by the note were $4,545 per month.[1] The note was secured by a deed of trust on an apartment complex, the Oak Tree Apartments, in Las Vegas, Nevada ("Property").

In June 1977, Bigelow and Banks transferred the Property to Marlene Azine and Buttons Swerdloff, d/b/a Oak Tree Associates. On January 8, 1979, the Property was transferred to Debtor. When ASL became aware of the latter transfer, it sent a letter dated June 2, 1980, to Debtor requesting that Debtor submit an application to assume the loan, and indicating that ASL had the option of calling the note due or of allowing the assumption. Debtor subsequently filed an application, and on June 24, 1980, ASL wrote to Debtor indicating that the assumption of the note had been approved, but with a new interest rate of 13.5%. On July 10, 1980, Debtor wrote to ASL indicating that it could not afford the loan at 13.5% and requesting that the interest rate be 11.75%. An internal memo dated July 15, 1980, was sent to the ASL loan committee indicating that Debtor requested the loan be at 11.75%. A notation on the memo dated July 24, states that the 13.5% figure is final.

From June, 1980 to March, 1981 Debtor apparently continued to make payments of $4,911.15 which were accepted by ASL. On March 31, 1981, ASL sent Debtor a new loan payment coupon, due April 10, 1981, along with a letter stating that the interest rate on the loan has been changed to 15% and that the new total payment on the loan would be $6,637.58 per month. Debtor sent another check for $4,911.15 that was returned by ASL along with a letter dated April 14, 1981. The letter stated that the monthly payments were now $6,637.58 and indicated that an assumption and modification agreement was enclosed for signature by Debtor. Finally, on May 15, 1981, ASL sent a letter to Debtor indicating that the interest rate on the loan would be 16% beginning with the June 10, 1981 payment, although Debtor had an option of purchasing one point on the loan and bringing the interest rate to 15% with total payments being $6,637.58.

Debtor apparently neither replied to any of the letters sent by ASL during March, April and May of 1981, nor signed the assumption and modification agreement. In June, 1981, however, Debtor began making $6,637.58 monthly payments to ASL. Debtor continued to make these payments until August, 1986. On February 23, 1987, Debtor filed a Chapter 11 petition. Debtor subsequently objected to the claim of First Western, the successor-in-interest to ASL. Debtor asserted that it had overpaid ASL in the approximate amount of $150,000, and that it was entitled setoff because of First Western's "breach of duty and good dealing" owed to Debtor. First Western opposed Debtor's objection, and on October 27, 1987, a hearing was held. Following

---

1. It appears that the total monthly payments were actually $4,911.15, which included im-  pounds for taxes.

additional briefing by the parties, the Court took the matter under advisement.

This Memorandum Decision constitutes the Court's finding of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## QUESTIONS PRESENTED

A. Whether the interest rate on the promissory note was modified from 10% to 15%.

B. Whether the modification is enforceable.

## DISCUSSION

### A. *Modification of the Note*

The original promissory note bore an interest rate of 10% per annum. First Western claims that when it allowed Debtor to assume the loan, the interest rate was increased to 15%. Debtor claims that First Western has not shown that the parties ever agreed to a modification.

Under Nevada law, a written contract may be orally modified by the parties. *Joseph F. Sanson Inv. Co. v. Cleland,* 97 Nev. 141, 142, 625 P.2d 566 (1981); *Clark County Sports Ent., Inc. v. City of Las Vegas,* 96 Nev. 167, 172, 606 P.2d 171 (1980); *Silver Dollar Club v. The Cosgriff Neon Co.,* 80 Nev. 108, 110, 389 P.2d 923 (1964). Although evidence of a modification must be clear and convincing, "consent to a modification may be implied from conduct consistent with an asserted modification." *Clark County Sports Ent., Inc.,* 96 Nev. at 172, 606 P.2d 171.

In the case at bar, the correspondence admitted into evidence and the conduct of the parties indicates that the parties agreed to increase the interest rate on the note to 15%. In June, 1980, First Western offered to let Debtor assume the promissory note with an increased interest rate of 13.5%. Debtor made a counter-offer of 11.75%, which First Western rejected. The status quo remained the same for eight months while Debtor made payments at the old rate. Then in March, 1981, First Western made a new offer to let Debtor assume the note with an interest rate of 15%.

Debtor responded by making a payment at the old rate which was rejected. First Western again indicated that its offer was to let Debtor assume with the rate of 15%. First Western then indicated that the rate would be the 16%, or 15% if Debtor purchased a point. After the latter offer, Debtor began making payments at the 15% rate which payments were accepted by First Western for over five years. This conduct clearly indicates that the parties had agreed that the new interest rate on the note would be 15%. Accordingly, First Western has established that a modification of the interest on the note occurred.

### B. *Enforceability of the Modification*

Debtor argues that the interest rate modification is unenforceable because (1) the payments at the 15% rate were made under duress, (2) the modification violates the statute of frauds, and (3) there is a failure of consideration.

Debtor claims that because First Western allegedly threatened to foreclose if the higher payments were not made, Debtor made the payments under protest and duress. Accordingly, Debtor asserts that the contract is unenforceable on grounds of duress. I disagree. First, there is no evidence that First Western threatened Debtor with foreclosure. The only suggestion of a "threat" is the June 2, 1980 letter in which First Western stated that it had the option to exercise the due-on-sale clause. This is not a "threat of foreclosure." Second, there is no evidence that the payments were made under duress or that Debtor protested making the payments: Debtor never wrote to First Western or to ASL indicating that it was making the payments under protest and there is no evidence of oral communications to that effect between Debtor and either lender. Even if Debtor objected to making the higher payments, it is difficult to understand why Debtor made the payments for *more than five years* then filed bankruptcy before raising the issue. Finally, First Western's "threat" to enforce the due-on-sale clause was the exercise of a legal

right, which does not constitute duress.[2] 25 Am.Jur.2d *Duress and Undue Influence* § 18 (1964 & Supp.1987).

Debtor next argues that the modification agreement is unenforceable because it does not comply with the statute of frauds. The Nevada Statute of Frauds requires that, in general, all contracts that either involve land transactions or that will not be completed within one year must be in writing. *See* Nev.Rev.Stat. §§ 111.-205, .210. The note in the case at bar comes within the statute because it is secured by a deed of trust. *See Summa Corp. v. Greenspun*, 96 Nev. 247, 252, 607 P.2d 569 (1980). There is, however, an exception to the statute of frauds where the doctrine of part performance applies. *Id.; Zunino v. Paramore*, 83 Nev. 506, 509, 435 P.2d 196 (1967). The doctrine of part performance applies where (1) the terms of the oral agreement are definitely established, (2) the acts of the performing party are "done with a view to the agreement being performed," and (3) the party seeking to enforce the agreement has performed or is ready and willing to perform the essentials of the agreement on his part. *Summa Corp.*, 96 Nev. at 253, 607 P.2d 569. Part performance must be shown by an "extraordinary measure or quantum of evidence. . . ." *Id.*

Applying this standard to the case at bar, I conclude that the doctrine of part performance applies. The only contractual term in question is the interest rate which, under the modification, is "definitely established" at 15% per annum. Debtor's making of payments at the higher rate of interest was aimed at repaying the loan at 15% and was therefore "done with a view to the agreement being performed." Finally, First Western performed its part of the bargain by allowing Debtor to assume the loan and forebearing from exercising the due-on-sale clause. Part performance therefore takes the modification agreement out of the statute of frauds.

Debtor next argues that the modification agreement is unenforceable because

First Western gave no consideration for the agreement. First Western's consideration for the modification agreement was its forbearance from exercising the due-on-sale clause. Debtor argues that there was a lack of consideration for one of two reasons. First, Debtor asserts that due-on-sale clauses are unenforceable under Nevada law. Alternatively, Debtor asserts that First Western waived the right to enforce the due-on-sale clause.

I turn first to the enforceability of the due-on-sale clause in Nevada at the time of the modification. In *First Commercial Title v. Holmes*, 92 Nev. 363, 550 P.2d 1271 (1976), the Nevada Supreme Court held that where a trustor of a deed of trust sold the encumbered property outright, the beneficiary under the trust deed could exercise a due-on-sale clause without proving impairment of its security. *Holmes* is analogous to the case at bar. Debtor argues that Nevada law has changed. Debtor apparently relies upon *Boyes v. Valley Bank*, 101 Nev. 287, 701 P.2d 1008 (1985). There, a trustor under a deed of trust sold the encumbered property to a third party using an installment land contract. The court held that, before it could exercise the due-on-sale clause in the trust deed, the beneficiary had to show that its security was impaired by the sale. The court specifically distinguished *Holmes* because *Holmes* involved an outright sale rather than an installment land contract. The court indicated that the validity of the holding in *Holmes* was "problematical". Nevertheless, *Holmes* was clearly still good law both when the note was originally executed and when the assumption in the case at bar occurred. I conclude, therefore, that the due-on-sale clause in the instant deed of trust was enforceable at the time of the modification.

Finally, Debtor asserts that, even if the due-on-sale clause was enforceable, First Western waived its right to enforce it by accepting payments at the 10% interest rate from August, 1980 to March, 1981. I disagree. A waiver is the intentional relin-

---

**2.** The enforceability of a due-on-sale clause in    Nevada is discussed below.

quishment of a known right. *Reno Realty & Inv. Co. v. Hornstein,* 72 Nev. 219, 225, 301 P.2d 1051 (1956). The intent to waive a right must be clearly and unequivocally manifested. *Melahn v. Melahn,* 78 Nev. 162, 166, 370 P.2d 213 (1962). *Kondas v. Washoe County Bank,* 50 Nev. 181, 188, 254 P. 1080 (1927). Moreover, the party asserting waiver must have been misled to his prejudice by the alleged waiver. *Melahn,* 78 Nev. at 166, 370 P.2d 213.

Here, between June, 1980 and May, 1981, the parties were negotiating regarding the Debtor's assumption of the loan. ASL's acceptance of payments at the lower rate while the new rate was being negotiated does not unequivocally indicate its intent to waive the due-on-sale clause. Moreover, ASL had indicated its intent to exercise the due-on-sale clause unless assumption by Debtor could be arranged. Thus, ASL's acceptance of the payments did not mislead Debtor to its prejudice and did not "lull Debtor into inactivity" regarding the clause. *See Id.; Summa Corp. v. Richardson,* 93 Nev. 228, 235, 564 P.2d 181 (1977). Because the due-on-sale clause was enforceable and had not been waived, First Western's forbearance to exercise the clause could properly serve as consideration for the modification agreement. 17 Am.Jur.2d *Contracts* § 114 (1964 & Supp. 1987).

### CONCLUSION

The interest rate on the promissory note was modified by agreement of the parties from 10% to 15% as of June, 1981. The modification is enforceable. Debtor's objection to the claim of First Western is therefore overruled and the claim is allowed with an interest rate running at 10% before June, 1981 and at 15% thereafter. Debtor retains the right to object to actual computation of amounts owed. A separate order will be entered.

