64 F.3d 670
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Garrett R. QUINTANA, Sr., Plaintiff-Appellant,
v.
FIRST NATIONAL BANK OF SANTA FE, Defendant-Appellee.
Garrett R. QUINTANA, sr., Plaintiff-Appellant,
v.
FIRST NATIONAL BANK OF SANTA FE, Defendant-Appellee.
 Nos. 94-2073, 94-2128.
 United States Court of Appeals, Tenth Circuit.
 Aug. 16, 1995.
 
 Before MOORE, SETH, and EBEL, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of these appeals. See Fed. R.App. P. 34(a); 10th Cir. R. 34.1.9. The cases are therefore ordered submitted without oral argument.
 
 
 2
 In case No. 94-2073, plaintiff-appellant Garrett R. Quintana, Sr., appeals the district court's order of summary judgment in favor of the First National Bank of Santa Fe (Bank) on his contract and tort claims against the Bank. In case No. 94-2128, Mr. Quintana, Sr. appeals the order of summary judgment in favor of the Bank on his claim that the Bank violated the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C.1972. Because there are no genuine issues of material fact and the Bank is entitled to judgment as a matter of law, we affirm the summary judgment in case No. 94-2073. As the banking relationship between Mr. Quintana, Sr. and his son entails material factual disputes, we reverse the summary judgment in case No. 94-2128, and remand for further proceedings.[2]
 
 Background
 
 3
 Mr. Quintana, Sr. is a land developer who has been involved in a number of real estate projects in Santa Fe, New Mexico. In 1984, his son, Garrett Quintana, Jr., entered into the development business upon graduating from college. To help him "cut [his] teeth," Mr. Quintana, Sr. assigned to his son a contract to purchase the Sears Building in Santa Fe, and introduced him to the Bank. Appendix, case No. 94-2128, at 94, 360. Under circumstances that are not completely clear, Mr. Quintana, Sr. conveyed several properties to his son. There is evidence that these conveyances were made both for estate planning purposes and to permit his son to pledge the properties to the Bank as collateral for the Sears loan. Apparently, some of the properties were later reconveyed to Mr. Quintana, Sr., and were again conveyed to Garrett Quintana, Jr. at a different time.
 
 
 4
 With Mr. Quintana, Sr.'s help, Garrett Quintana, Jr. negotiated a $450,000 loan from the Bank for the purchase of the Sears Building, to be made to a limited partnership called Lincoln Partners. Garrett Quintana, Jr. was the general partner in this partnership. It is undisputed that Mr. Quintana, Sr. had no ownership interest in the entity. The Sears loan was secured by a mortgage on several pieces of real property.
 
 
 5
 In 1985, the Bank offered to sell a piece of property to Garrett Quintana, Jr., known as the "Calle Lorca" property. The Bank allegedly promised that if Garrett Quintana, Jr. bought the property and obtained rezoning for self-storage units, the Bank would refinance the land purchase and the proposed development at its prime interest rates. Garrett Quintana, Jr. entered into a loan agreement with the Bank for $211,500, purchased the property, and obtained the zoning change. Upon the Bank's refusal to refinance the transaction, Garrett Quintana, Jr. ceased paying on his promissory note and threatened to sue the Bank.
 
 
 6
 Also in 1985, Mr. Quintana, Sr. located a piece of property with potential to be developed into a trailer park. Garrett Quintana, Jr. and a long-time family friend of his father, C.L. Brown, formed the Vista Verde partnership and obtained a loan from the Bank for $355,000. It is unclear whether Mr. Quintana, Sr. was intended originally to be a partner in Vista Verde, but it is undisputed that he had no interest in the partnership when the deal was finalized. The Bank allegedly reneged on another promise to provide financing for development, and Vista Verde ceased paying on the note. Mr. Quintana, Sr. had several conversations with the Bank regarding their alleged breach, and threatened to sue the Bank.
 
 
 7
 In 1987, C.L. Brown bought the Vista Verde note from the Bank. To finance the purchase, Mr. Quintana, Sr. guaranteed payment of the Vista Verde note to Mr. Brown, and Mr. Brown then pledged the old note to the Bank as security for the funds borrowed to cover its purchase.
 
 
 8
 In March 1989, the Sears note was overdue. Mr. Quintana, Sr. mortgaged a piece of property to secure repayment of the note by Garrett Quintana, Jr. The Sears note was finally repaid in November 1989.
 
 
 9
 In September 1989, Mr. Quintana, Sr. sought a loan from the Bank to purchase and develop 324.64 acres of undeveloped land. An extensive loan agreement was negotiated, containing the following provisions:
 
 
 10
 The $1,762,000 loan was to mature on May 31, 1990. The maturity date could be extended, however, to August 31, 1991, upon satisfaction of certain conditions by May 31, 1990, including (1) obtaining final approval of a subdivision plat for the property; (2) establishing access to the proposed development; (3) selling certain real property; (4) arranging to sell or hypothecate certain real estate contracts to an institutional lender; (5) completing engineering work; (6) selling sixty undivided interests in the property; and (7) concluding a quiet title action concerning access to the property. Appendix, case No. 94-2073, at 26-27.
 
 
 11
 The loan agreement specified that "In no event shall the Maturity Date be extended if all conditions to which the extension option is subject are not met unless such condition is expressly waived by the Bank in writing." Id. at 27. The agreement also stated that the Bank would consider extending the date for obtaining subdivision approval, but that "a grant of such an extension shall be in the Bank's sole discretion and the Bank shall have absolutely no obligation to grant it." Id. at 26.
 
 
 12
 As security for the loan, Mr. Quintana, Sr. was required to give the Bank (1) a first deed of trust on the undeveloped land; (2) a first deed of trust on other land owned by Quintana, Sr.; (3) a first deed of trust on the Calle Lorca property owned by Garrett Quintana, Jr.; and (4) assignments of a promissory note, stocks, construction contracts, the proceeds from a real estate contract, any interest in the escrow accounts, and any proceeds from the collateral described above. Id. at 17-18.
 
 
 13
 As an inducement to the Bank to make the loan, Mr. Quintana, Sr. warranted that he would "diligently pursue" (1) acquisition of access to the undeveloped property; (2) a condemnation action of certain land to obtain further access to the property; (3) utility services for the property; and (4) final unappealable county approval of a subdivision plat for the property. Id. at 18-20.
 
 
 14
 In addition, Mr. Quintana, Sr. agreed, inter alia, to guarantee a portion of his son's debt to the Bank, and to deliver to the Bank releases of all claims against the Bank by his son, Quintana, Jr., and his son's business partners, Lee [C.L.] and Merritt Brown. Id. at 22, 24. Apparently, Mr. Quintana, Sr. also promised to pay his son's Calle Lorca promissory note to the Bank, although such promise is not included within the loan documents. The loan agreement stated, however, that the loan to Mr. Quintana, Sr. would be increased by $211,500 for that purpose. Id. at 17.
 
 
 15
 The loan agreement also contained several miscellaneous provisions, including a requirement that all amendments or modifications be in writing, id. at 29, and a provision that
 
 
 16
 This Agreement constitutes the entire agreement between the parties. All prior or contemporaneous negotiations and/or understandings are merged herewith. No prior or contemporary negotiation, understanding or agreement shall be binding unless expressly contained in this Agreement. There are no promises of any kind, and no obligations whatsoever, with respect to the subject matter of this Agreement, any future or other financing, loans, funds, advances, waivers, forebearances, or otherwise, except those specifically set forth in this Agreement.
 
 
 17
 Id. at 31.
 
 
 18
 Mr. Quintana, Sr. alleges that when he entered into the agreement with the Bank, he informed them that it was doubtful that he could meet the access and subdivision approval requirements by the May 31, 1990 maturity date. He contends that the Bank orally assured him that the loan maturity date would be extended so long as he continued to pursue diligently road access and county subdivision approval.
 
 
 19
 On May 31, 1990, Mr. Quintana, Sr. did not repay the loan or meet the conditions entitling him to an extension. Nevertheless, the Bank and Mr. Quintana, Sr. agreed, in writing, to modify the loan agreement on three separate occasions so as to extend the maturity date. Id. at 159, 188, 189. Each loan modification agreement recited that consideration was given for the extension, and noted that interest would accrue at thirteen percent, instead of the original interest rate of prime plus one and one-half percent. See id. at 16, 159, 188, 189. When signing the second and third modifications, Mr. Quintana, Sr. also signed an acknowledgment that New Mexico law required any extension, renewal or modification of a loan contract for more than $25,000 to be in writing and signed by the party to be charged. Id. at 190, 191. Under the third and final agreement, Mr. Quintana, Sr.'s loan became due on October 25, 1991. Id. at 189.
 
 
 20
 Mr. Quintana, Sr. failed to repay the loan when it became due. On October 25, 1991, the Bank notified Mr. Quintana that he was in default. During the next several months, the Bank and Mr. Quintana attempted to reach an agreement as to repayment of the overdue principal and interest. See id. at 161-181. On January 13, 1992, the Bank liquidated the cash collateral and applied it to Mr. Quintana, Sr.'s loan. On May 13, 1992, the Bank issued a notice of sale and a notice of default and election to sell the real property securing the loan. Apparently, Mr. Quintana, Sr. has since sold a portion of the real property and has satisfied his debt to the Bank.
 
 
 21
 Mr. Quintana, Sr. filed two actions against the Bank in the United States District Court for the District of New Mexico. The first sought damages for the Bank's alleged breach of contract and commission of a prima facie tort. The breach of contract claim was based on Mr. Quintana, Sr.'s allegation that the loan agreement had been modified, either by an oral promise when the contract was made, or by the parties' course of conduct in extending the loan after it became due. The second action sought damages for the Bank's alleged violation of the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C.1972.
 
 
 22
 The district court granted summary judgment in favor of the Bank in the first action on the ground that the alleged modification of the loan agreement was barred by N.M. Stat. Ann. 58-6-5B (Michie 1978), and by the common law statute of frauds. The court indicated its belief that the parol evidence rule would also bar the contract claim, but felt it unnecessary to rely on this ground. Summary judgment was granted on the tort claim because there was no evidence of an intent to injure Mr. Quintana, Sr., or of insufficient justification for the Bank's conduct. Citing Palermo v. First National Bank & Trust Co., 894 F.2d 363, 367 (10th Cir.1990), the district court granted summary judgment in the second action as well, holding that there was no prohibited tying because Mr. Quintana, Sr. and his son, Garrett Quintana, Jr., were related or affiliated entities. These appeals followed.
 
 
 23
 We review a grant of summary judgment de novo, applying the same standards as those used by the district court. Pride v. Does, 997 F.2d 712, 716 (10th Cir.1993). Summary judgment is appropriate when "the pleadings [and] depositions ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We view the record in the light most favorable to the party opposing the motion. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir.1991). Because case No. 94-2073 was premised on diversity jurisdiction, we apply the substantive law of New Mexico. See Minnstar, 8 F.3d at 1476.
 
 Case No. 94-2073
 
 24
 Mr. Quintana, Sr. argues that the district court erred in granting summary judgment on his breach of contract claim because the evidence raised a factual question whether the loan agreement had been modified (1) by the Bank's alleged oral promise made at the time the parties entered into the contract, or (2) by the parties' course of conduct of extending the contract after the loan became due. In addition, he argues that the tort claim should not have been dismissed because the evidence raised a factual question whether the Bank's actions were malicious, were done with an intent to injure, and were done with insufficient justification.
 
 
 25
 We address first the sufficiency of the evidence regarding the Bank's alleged oral promise, made at the time the loan was negotiated, to extend the loan maturity date. The district court held the alleged promise unenforceable based on N.M. Stat. Ann. 58-6-5B, which provides:
 
 
 26
 A contract, promise or commitment to loan money or to grant, extend or renew credit or any modification thereof, in an amount greater than twenty-five thousand dollars ($25,000), not primarily for personal, family or household purposes, made by a financial institution shall not be enforceable unless in writing and signed by the party to be charged ... provided however, that the provisions of this section shall not apply unless the financial institution is able to produce a statement signed by the borrower ... that he or she is aware of the provisions of this section.
 
 
 27
 By its terms, the statute requires that a borrower sign a statement acknowledging its application before an oral agreement will be rendered unenforceable. As the statute was not enacted until March 1990, Mr. Quintana, Sr. could not have been aware of its provisions when the Bank allegedly promised to extend the loan in September 1989. The statute, therefore, does not render the alleged promise unenforceable.
 
 
 28
 The district court also held the alleged oral promise unenforceable based on the common law statute of frauds. New Mexico has adopted the English statute of frauds, requiring contracts for the conveyance of land or an interest in land to be in writing, as a part of its common law. Viramontes v. Fox, 335 P.3d 1071, 1074 (N.M.1959); see also Aragon v. Rio Costilla Coop. Livestock Ass'n, 812 P.2d 1300, 1303 (N.M.1991). Mr. Quintana, Sr. argues that an agreement to extend a loan maturity date is not within the common law statute of frauds because it does not affect an interest in land.
 
 
 29
 A number of jurisdictions have held that an agreement to make or modify a loan secured by a mortgage or deed of trust falls within the statute of frauds and must be in writing to be enforceable. See, e.g., Frame v. Boatmen's Bank, 782 S.W.2d 117, 119-20 (Mo.Ct.App.1989); Marine Midland Bank, N.A. v. Cafferty, 571 N.Y.S.2d 628, 632 (N.Y.App.Div.1991); Atlantic Fin. Fed. v. Orianna Historic Assocs., 594 A.2d 356, 319 (Pa.Super.1991); Lambert v. Home Fed. Sav. & Loan Ass'n, 481 S.W.2d 770, 772-73 (Tenn.1972); Foster v. Mutual Sav. Ass'n, 602 S.W.2d 98, 100 (Tex.Civ.App.1980); see also In re Desert Enters., 87 B.R. 631, 634 (Bankr.D.Nev.1988). These jurisdictions subscribe to the "title theory" of mortgages, under which a mortgage or deed of trust actually conveys an interest in the real property. See generally Martyn v. First Fed. Sav. & Loan Ass'n, 257 So.2d 576, 577-79 (Fla.Dist.Ct.App.1971), cert. denied, 262 So.2d 446 (Fla.1972); 3 Samuel Williston, A Treatise on the Law of Contracts 491 (3d ed. Supp.1994); 1 Garrad Glenn, Glenn on Mortgages 28-31 (1943).
 
 
 30
 New Mexico, in contrast, is a "lien theory" state. N.M. Stat. Ann. 48-10-8 (Michie 1978)("The lien theory of mortgages in New Mexico shall continue to apply to deeds of trust...."). In New Mexico, therefore, a mortgage is merely a lien and does not convey title to the mortgaged property. Texas Am. Bank/Levelland v. Morgan, 733 P.2d 864, 865 (N.M.1987); Slemmons v. Massie, 690 P.2d 1027, 1028 (N.M.1984). It follows, therefore, that an agreement to make or modify a mortgage or deed of trust does not fall within the common law statute of frauds as applied in New Mexico, and the alleged oral agreement to extend would not be unenforceable.
 
 
 31
 Although the district court found it unnecessary to rely on the parol evidence rule to support its grant of summary judgment, we believe that this rule operates to preclude evidence of the Bank's alleged oral promise at the time the loan was negotiated. When the parties have entered into an integrated agreement, parol evidence is inadmissible to " 'contradict, vary, modify or add to a written agreement.' " Dave Zerwas Co. v. James Hamilton Constr. Co., 876 P.2d 653, 655 n. 2 (N.M.1994)(quoting Yrisarri v. Wallis, 418 P.2d 852, 854 (N.M.1966))(further quotation omitted); see also Wilburn v. Stewart, 794 P.2d 1197, 1198-99 (N.M.1990)(noting that evidence of an oral agreement entered into contemporaneously with a written agreement is inadmissible to vary or contradict the written agreement's terms, either in its express provisions or legal import).
 
 
 32
 Here, the loan agreement contained a clear integration clause, which stated specifically that there were no promises of any kind regarding future waivers or forebearances, except those set out in the agreement. Because evidence of the Bank's alleged oral promise would contradict the contract's express provisions regarding extension of the loan maturity date and the absence of promises to waive or forbear, the parol evidence rule precludes its admission. Although it is true that such evidence may be introduced to show an oral promise which induced a party to enter into the agreement, this exception to the parol evidence rule has no bearing here as Mr. Quintana, Sr. is seeking to enforce the contract, not to rescind it for fraud. See Clark v. Sideris, 656 P.2d 872, 876 (N.M.1982).
 
 
 33
 We turn next to Mr. Quintana, Sr.'s claim that the agreement was modified subsequently by the parties' course of conduct, to include an agreement that the loan would be extended so long as Mr. Quintana, Sr. diligently pursued access and subdivision approval, and to require the Bank to pay itself accrued interest from the cash collateral. A contract may be modified by the parties' conduct if the conduct shows that the parties mutually agreed to amend the agreement, and that the modification was supported by consideration. J.R. Hale Contracting Co. v. United N.M. Bank, 799 P.2d 581, 586, 588 (N.M.1990); see also Kelly Inn No. 102, Inc. v. Kapnison, 824 P.2d 1033, 1047 (N.M.1992).
 
 
 34
 Here, the evidence does not raise a genuine issue of fact whether the Bank agreed to waive its right to enforce the loan agreement. The Bank's conduct in extending the loan was consistent with its legal rights under the agreement, and there is nothing to suggest that the Bank intended to modify these rights. Further, there is no evidence that consideration was given to support the alleged modification. Mr. Quintana, Sr. was already obligated under the agreement to pursue diligently the access and subdivision approval, thus his promise to do so would not provide new consideration. Cf. Superior Concrete Pumping, Inc. v. David Montoya Constr., Inc., 773 P.2d 346, 349 (N.M.1989).
 
 
 35
 In addition, no factual dispute has been shown regarding the alleged modification requiring the Bank to pay itself accrued interest out of the cash collateral, as we have not been directed to evidence showing when and how often the Bank took this action in the past. Summary judgment in favor of the Bank was proper, therefore, on Mr. Quintana, Sr.'s breach of contract claim.
 
 
 36
 Summary judgment was also proper on the prima facie tort claim. To survive summary judgment, Mr. Quintana, Sr. was required to show a factual issue whether the Bank acted maliciously, with the intent to cause injury, and without justification or with insufficient justification. See Schmitz v. Smentowski, 785 P.2d 726, 735 (N.M.1990). We agree with the district court that Mr. Quintana, Sr. has failed to raise a genuine issue of fact as to any of these elements.
 
 Case No. 94-2128
 
 37
 Mr. Quintana, Sr. argues that the district court erred in granting summary judgment on his action against the Bank for violation of 12 U.S.C.1972(1)(C). That section prohibits a bank from conditioning the extension of credit on a customer's provision of "some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan ... service." Id. A violation of the statute is proved by showing that the condition imposed was unusual, resulted in an anticompetitive tying arrangement, and benefitted the bank in a way other than merely providing additional asset protection. Alpine Elec. Co. v. Union Bank, 979 F.2d 133, 135 (8th Cir.1992); Palermo, 894 F.2d at 367-68.
 
 
 38
 Mr. Quintana, Sr. contends that the loan agreement per se violated the statute by requiring that (1) he pay his son's note to the Bank; (2) he guarantee a portion of his son's outstanding indebtedness; (3) he arrange for his son's real property to be pledged as collateral; and (4) he obtain releases from his son, C.L. Brown, and Merritt Brown. The district court held Mr. Quintana, Sr.'s evidence insufficient to raise a factual dispute whether the Bank's practices were unusual or anticompetitive. Based on Palermo, the court held that Mr. Quintana, Sr. and his son were affiliated customers for lending purposes, and that, therefore, the conditions imposed by the Bank were not anticompetitive tying arrangements, but were "traditional banking practices" designed to protect the Bank's investment.
 
 
 39
 This court has held that "[c]onditioning the extension of credit to a bank customer on the requirement that the customer participate in the bank's bad loans to an unrelated customer surely is an anticompetitive practice proscribed by 1972." Palermo, 894 F.2d at 369 (emphasis added); see also Nordic Bank PLC v. Trend Group, Ltd., 619 F.Supp. 542, 557 (S.D.N.Y.1985); cf. Bieber v. State Bank, 928 F.2d 328, 331 (9th Cir.1991). Evidence of such a condition also establishes a genuine issue of fact whether the bank engaged in an unusual banking practice. Tri-Crown, Inc. v. American Fed. Sav. & Loan Ass'n, 908 F.2d 578, 585 (10th Cir.1990); cf. Alpine Elec. Co., 979 F.2d at 135-36. The crucial question, therefore, is whether Mr. Quintana, Sr.'s evidence regarding his business relationship with his son was sufficient to create a factual dispute as to whether they were "related" customers for lending purposes.
 
 
 40
 In Palermo, we examined the relationship between an individual, Mr. Palermo, and two corporations, Cup Expolation, Inc., and Three Sisters Investments, Ltd., to determine whether the evidence of an anticompetitive practice was sufficient to withstand summary judgment. There, the bank had conditioned renewal of Mr. Palermo's personal note on the requirement that Mr. Palermo and Three Sisters guarantee a note upon which Cup Exploration had defaulted. We held that the parties were affiliated borrowers based on the undisputed facts that (1) Mr. Palermo was an officer, director and the owner of a one-third interest in Cup Exploration; (2) Mr. Palermo had sought the disputed loan on behalf of Cup Exploration and had signed the note in his official capacity; (3) Mr. Palermo had identified Cup Exploration's loan as "affiliated debt" in an earlier loan application; (4) Mr. Palermo was an officer and employee of Three Sisters; (5) Mr. Palermo sought a loan on behalf of Three Sisters and signed the note in his individual capacity; and (6) Mr. Palermo's wife and children held 55% of the stock in Three Sisters, and the remaining 45% was held by Mr. Palermo's brother. 894 F.2d at 369-370. Because the practice of requiring a customer to guarantee affiliated debt before extending further credit is not anticompetitive or unusual, we held that summary judgment was proper. Id. at 370.
 
 
 41
 Here, in contrast, Mr. Quintana, Sr. did not have any ownership interest in the properties purchased by his son or in the entities through which his son purchased the properties. He was neither an officer nor an employee of any of these entities, did not sign any of the promissory notes, and did not represent to the Bank that his son's debts were "affiliated." Further, there are several factual disputes regarding Mr. Quintana, Sr.'s business and borrowing relationships with his son. For example, it is unclear whether Mr. Quintana, Sr. was originally intended to be a partner in Vista Verde and whether the Bank was informed of this fact. See Appendix, case No. 94-2128, at 131-32, 134, 362. It is also unclear whether the parties considered the possibility of Mr. Quintana, Sr. guaranteeing the Lincoln Partners loan when it was negotiated. Id. at 218. Although there is evidence that Mr. Quintana, Sr. helped negotiate his son's loans, that certain real property passed between father and son, and that Mr. Quintana, Sr. later guaranteed some of his son's debts, the evidence is not "so one-sided that [the Bank] must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).
 
 
 42
 In addition, the expert opinion of Mr. Strybosch should not have been disregarded. The district court disregarded Mr. Strybosch's opinion that the conditions imposed by the bank violated the anti-tying provisions of 12 U.S.C.1972 because this was merely a legal conclusion. In light of the court's order limiting the parties' exhibits to seventy-five pages, we believe it was a fair inference that the expert's conclusion included his opinion that the conditions imposed were not usual and customary banking practices.
 
 
 43
 The district court also rejected the expert opinion of Philip White as "legally insignificant," on the ground that "the factual bases for Mr. White's opinions differ materially from the facts upon which I base my opinions, which facts I find most legally significant according to Palermo." Appendix, case No. 94-2128, at 71. This conclusion, however, goes to the weight of Mr. White's opinions, and not their "legal significance." See, e.g., McAlester v. United Air Lines, Inc., 851 F.2d 1249, 1258-59 (10th Cir.1988)(failure of expert to consider the facts surrounding the termination of each employee went to the weight of the expert's statistical analysis, not its admissibility).
 
 
 44
 Moreover, the court's statement that there is no indication that Mr. White considered whether the two banking customers were related is contradicted by the record. Mr. White relied on the facts as set out in the complaint, including the allegation that Mr. Quintana, Sr. and his son "were not business partners or involved in mutual business enterprises and as to the Bank were individual customers and borrowers," and that Mr. Quintana, Sr. was not a co-maker or guarantor of the Calle Lorca note. Appendix, case No. 94-2128 at 2-3.
 
 
 45
 The Bank argues that the summary judgment was nevertheless correct because the only "injury" alleged by Mr. Quintana, Sr. was the requirement that he borrow additional funds and the statute expressly exempts an arrangement through which a customer is required to take an additional loan. See 1972(1)(A). The crux of Mr. Quintana, Sr.'s complaint, however, is that he was required to pay one of his son's debts, and to guarantee another. The fact that this obligation was met through the borrowing of additional funds is irrelevant.
 
 
 46
 The Bank also argues that Mr. Quintana, Sr. lacks standing to complain of the requirements that his son pledge the Calle Lorca property and that releases be signed by his son, Merritt and C.L. Brown. Although this issue was not raised before the district court, we must address it because standing involves a constitutional limitation of a federal court's jurisdiction. See Bangerter v. Orem City Corp., 46 F.3d 1491, 1497 (10th Cir.1995). Because Mr. Quintana, Sr. has suffered no redressable injury from these loan conditions, he lacks standing to pursue his damages claim for these alleged tying arrangements, which affected only his son, Merritt and C.L. Brown. See id. at 1497-99; 12 U.S.C.1975.
 
 
 47
 The Bank also argues that Mr. Quintana, Sr.'s tying claim is barred by a release contained in the loan agreement. As the district court did not rule on this issue and it is not clear whether the issue was actually raised before that court, we will not address the release on appeal. See R. Eric Peterson Constr. Co. v. Quintek, Inc. (In re R. Eric Peterson Constr. Co.), 951 F.2d 1175, 1182 (10th Cir.1991)(holding that an appellate court will not consider issues not passed upon below).
 
 
 48
 In case No. 94-2073, the judgment of the United States District Court for the District of New Mexico is AFFIRMED. In case No. 94-2128, the judgment of the United States District Court for the District of New Mexico is REVERSED, and the case is REMANDED for further proceedings.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 In both cases, the district court placed a seventy-five page limit on the exhibits the parties could submit in support of their summary judgment positions. Neither party has appealed this ruling. Instead, the parties have stipulated that the record on appeal should consist of 418 pages in case No. 94-2073, and 492 pages in case No. 94-2128, and that this court should consider the excluded material in making its determination. Appellant's Br., case No. 94-2073, at 4; Appellee's Br., case No. 94-2073, at 5 n. 5; Appellant's Br., case No. 94-2128 at 2; Appellee's Br., case No. 94-2128, at 3 n. 3. In addition, Mr. Quintana, Sr. has argued that the district court relied on some of the excluded exhibits in making its determination. Appellant's Br., case No. 94-2073, at 4; Appellant's Br., case No. 94-2128, at 2
 When reviewing an order of summary judgment, we consider only those materials that were before the district court when the ruling was made. Allen v. Minnstar, Inc., 8 F.3d 1470, 1475 (10th Cir.1993); see also Ambus v. Granite Bd. of Educ., 975 F.2d 1555, 1569 (10th Cir.1992)(holding that this court "will not reverse the grant of summary judgment ... based on evidence not before the district court"), modified on other grounds, 995 F.2d 992 (10th Cir.1993). In making our decision, therefore, we have considered only those exhibits before the district court.