United States Court of Appeals,

Eleventh Circuit.

No. 96-8019.

Rebecca Otwell BAGGETT, Teressa Latrelle Otwell, Frances Otwell Bagby, Plaintiffs-Appellants,

v.

FIRST NATIONAL BANK OF GAINESVILLE, Defendant-Appellee.

July 28, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:95-CV-684-FMH), Frank Hull, Judge.

Before HATCHETT, Chief Judge, TJOFLAT, Circuit Judge, and CLARK, Senior Circuit Judge.

CLARK, Senior Circuit Judge:

We have reviewed plaintiffs/appellants' complaint filed in district court, appellants' brief, the applicable statutes, and the Congressional History of the Bank Holding Company Act and we agree with the district court's holding that the Act does not grant federal court jurisdiction of a lawsuit brought by the heirs of a decedent challenging a bank's actions as Trustee and Executor of the decedent's estate.

Since the opinion of the district court amply describes the issues and controlling law, we hereby adopt the district court's opinion of November 28, 1995, attached hereto as Exhibit A.

AFFIRMED.

Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION.

Rebecca Otwell Baggett, Teressa Latrelle Otwell, and Frances Otwell Bagby, Plaintiffs,

v.

First National Bank of Gainesville, Defendant.

CIVIL ACTION NO. 1:95-CV-684-FMH.

*ORDER*

This case is before the Court on the Defendant First National Bank of Gainesville's Motion

to Dismiss for want of subject matter jurisdiction [3-1]. After reviewing the record and hearing oral argument from counsel for the parties, the Court grants Defendant's Motion to Dismiss.

I. *FACTS*

Plaintiffs Rebecca Otwell Baggett, Teressa Latrelle Otwell, and Frances Otwell Bagby ("Plaintiffs") are beneficiaries of the Estate of Roy P. Otwell, Sr. and contingent beneficiaries under certain testamentary trusts created under the Last Will and Testament of Roy P. Otwell, Sr. The Defendant First National Bank of Gainesville ("Defendant") serves as (a) Executor of the Last Will and Testament of Roy P. Otwell and Trustee of the testamentary trust under that Will; (b) Trustee of a trust created by the Will and a consent order entered in a state court action consented to by all parties herein; and (c) as Trustee of an Inter Vivos Trust created by Roy P. Otwell in 1984 for the benefit of Roy P. Otwell, Jr., an incompetent son of Roy P. Otwell, Sr. Plaintiffs are contingent beneficiaries of the 1984 Inter Vivos Trust and beneficiaries of the testamentary trust under the Last Will and Testament.

Plaintiffs contend, *inter alia,* that Defendant breached its fiduciary duties as trustee and committed acts of mismanagement, neglect and self-dealing, by specifically (a) failing to fund properly a testamentary trust for Roy Otwell, Jr.; (b) by overvaluing the real estate assets in the estate thereby causing the estate to pay unnecessary taxes and administration fees; (c) engaging in self-dealing by making a loan to the estate at an excessive rate of interest; (d) spending excessive amounts of money remodeling a house for Roy Otwell, Jr.; (e) transferring an easement to the City of Cumming for little or no consideration over Plaintiffs' objections; and (f) charging attorneys' fees to the estate that should have been paid by Defendant. According to Plaintiffs, this alleged pattern of misconduct resulted in a pecuniary gain to Defendant.

Plaintiffs assert that their Complaint presents a federal question under the Bank Holding Company Act ("BHCA" or "Act"), 12 U.S.C. § 1972(2)(F) & 12 U.S.C. § 1975 (1994). Specifically, Plaintiffs contend that Defendant's alleged misconduct violated the provisions of § 1972(2)(F)(ii), that Plaintiffs lost money as a result, and that Plaintiffs may thus sue under § 1975 for injury in their "property by reason of [conduct] forbidden in section 1972." 12 U.S.C. § 1975 (1994). As outlined

below, this Court finds that Plaintiffs' Complaint fails to state a cause of action under the BHCA, and thus Plaintiffs' Complaint is dismissed for lack of subject matter jurisdiction.

## II. *BANK HOLDING COMPANY ACT CLAIM*

The jurisdiction of the federal courts is limited to the jurisdiction which Congress has prescribed. *Local Division 732, Amalgamated Transit Union v. Metropolitan Atlanta Rapid Transit Authority,* 667 F.2d 1327, 1330 (11th Cir.1982); *accord Taylor v. Appleton,* 30 F.3d 1365 (11th Cir.1994). In determining whether Congress intended to confer a private right of action, congressional intent is the dispositive inquiry. *Amalgamated Transit Union,* 667 F.2d at 1334-35; *see also Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979) ("[O]ur task is limited solely to determining whether Congress intended to create the private right of action."). Congressional intent to create a private right of action will not be presumed. There must be clear evidence of Congress's intent to create a cause of action. *Touche Ross,* 442 U.S. at 570, 99 S.Ct. at 2486 ("[I]mplying a private right of action on the basis on congressional silence is a hazardous enterprise, at best."); *Amalgamated Transit Union,* 667 F.2d at 1335 ("In order for us to infer a private right of action, or federal jurisdiction, we must have before us clear evidence that Congress intended to provide such a remedy...."). Thus, the Court first examines the legislative history of the BHCA.

A. *Legislative History Of The Bank Holding Company Act*

1. *The Anti-Tying Provisions of the BHCA*

The BHCA was enacted in 1956. The original focus of the BHCA was the regulation of the power of bank holding companies to prevent a small number of powerful banks from dominating commerce and to ensure a separation of economic power between banking and commerce. *Parsons Steel v. First Alabama Bank of Montgomery,* 679 F.2d 242, 244 (11th Cir.1982); S.Rep. No. 91-1084, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.C.C.A.N. 5519, 5535 (1970); 116 Cong.Rec. 32127 (1970). In 1970, Congress amended the Act to reach the anti-competitive practices of even smaller banks, which notwithstanding their comparative size, were able to exert economic power over businesses because of their control over credit.

Against this backdrop, Congress drafted a one paragraph, five subpart section prohibiting certain tying arrangements. The present incarnation of these provisions comprise § 1972(1), which provides as follows:

> (1) A bank shall not in any manner extend credit, lease or sell property of any king, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—
>
> (A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;
>
> (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;
>
> (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;
>
> (D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company; or
>
> (E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.
>
> The Board may by regulation or order permit such exceptions to the foregoing prohibition as it considers will not be contrary to the purposes of this chapter.

12 U.S.C. § 1972(1) (1994). Simultaneously, Congress enacted § 1975 of the BHCA, creating a private right of action in favor of individuals harmed by virtue of violations of the anti-tying provisions of the BHCA. Section 1975 states as follows:

> Any person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including reasonable attorney's fees.

12 U.S.C. § 1975 (1994).

In enacting the anti-tying provision of the BHCA, and providing a private right of action in favor of individuals injured by violations thereof, Congress was targeting anti-competitive banking practices. The Act proscribes anti-competitive ties which condition the extension of credit on a

condition designed to increase the economic power of the bank and to reduce competition. Such a tie can manifest itself in many different forms. The bank can refuse to extend credit unless the consumer agrees to purchase a separate, unrelated bank service (a quintessential tie); the bank can condition the extension of credit on the consumer providing the bank with a specific product or service unrelated to the extension of credit (a reciprocal tie); or the bank can condition the extension of credit on the consumer's agreement not to engage in any transactions with one of the bank's competitors (an exclusive dealing arrangement). A tie can manifest itself in a number of other ways, but the touchstone for actionability under the anti-tying provision of the BHCA is that the arrangement be designed to lessen competition and increase the economic power of the creditor bank. *Davis v. First Nat'l Bank of Westville,* 868 F.2d 206, 208 (7th Cir.1989) ("The antitrust laws are concerned with tie-ins and reciprocity agreements when they enable a party with sufficient power in one market to avoid the standard market criteria of price, quality, and service in another market and thereby lessen competition.").

The purpose and effect of the anti-tying provisions of § 1972 are to apply general antitrust principles to the field of commercial banking without requiring plaintiffs to prove anti-competitive effect or market power. Nevertheless, the plaintiff must still complain of a practice that is anti-competitive. *Parsons Steel v. First Alabama Bank of Montgomery,* 679 F.2d 242, 245 (11th Cir.1982).

2. *Regulation of Insider Activities*

In the mid-1970s, the banking industry again was the subject of allegations of financial misconduct. This time, however, banks were not accused of activities injuring individual consumers, but rather insider activities harming the banking industry itself. Prompted in part by revelations of insider activities, the House Committee on Banking, Finance and Urban Affairs ordered the General Accounting Office to conduct a study of all three federal banking agencies and the Committee itself launched a massive series of studies and hearings on the structure, powers, and operations of financial institutions and the regulatory system. H.R.Rep. No. 95-1383, 95th Cong., 2d Sess. 9, *reprinted in* 1978 U.S.C.C.A.N. 9273, 9281 (1978). After reviewing these studies, the

Committee concluded that insider activities carried on between correspondent banks were a principal vehicle of abuse by banks resulting in bank failures. H.R.Rep. No. 95-1383, *reprinted in* 1978 U.S.C.C.A.N. 9273, 9281 (1978).

In response to the study's findings, Congress enacted the Garn-St. Germain Depository Institutions Act of 1982, officially titled the Financial Institutions Regulatory and Interest Rate Control Act of 1978 ("FIRIRCA"). H.R.Rep. No. 95-1383, *reprinted in* 1978 U.S.C.C.A.N. 9273 (1978). FIRIRCA proscribed banks from engaging in certain insider activities; specifically, FIRIRCA prohibited certain loans to banks where correspondent accounts or insiders were involved. These proscriptions formed the second paragraph within § 1972 of the BHCA, and currently are contained in § 1972(2)(A)-(D), which states as follows:

> (2)(A) No bank which maintains a correspondent account in the name of another bank shall make an extension of credit to an executive officer or director of, or to any person who directly or indirectly or acting through or in concert with one or more persons owns, controls, or has the power to vote more than 10 per centum of any class of voting securities of, such other bank or to any related interest of such person unless such extension of credit is made on substantially the same terms, including interest rates and collateral as those prevailing at the time for comparable transactions with other persons and does not involve more than the normal risk of repayment or present other unfavorable features.

> (B) No bank shall open a correspondent account at another bank while such bank has outstanding an extension of credit to an executive officer or director of, or other person who directly or indirectly or acting through or in concert with one or more persons owns, controls, or has the power to vote more than 10 per centum of any class of voting securities of, the bank desiring to open the account or to any related interest of such person, unless such extension of credit was made on substantially the same terms, including interest rates and collateral as those prevailing at the time for comparable transactions with other persons and does not involve more than the normal risk of repayment or present other unfavorable features.

> (C) No bank which maintains a correspondent account at another bank shall make an extension of credit to an executive officer or director of, or to any person who directly or indirectly acting through or in concert with one or more persons owns, controls, or has the power to vote more than 10 per centum of any class of voting securities of, such other bank or to any related interest of such person, unless such extension of credit is made on substantially the same terms, including interest rates and collateral as those prevailing at the time for comparable transactions with other persons and does not involve more than the normal risk of repayment or present other unfavorable features.

> (D) No bank which has outstanding an extension of credit to an executive officer or director of, or to any person who directly or indirectly or acting through or in concert with one or more persons owns, controls, or has the power to vote more than 10 per centum of any class of voting securities of, another bank or to any related interest of such person shall open a correspondent account at such other bank, unless such extension of credit was made on substantially the same terms, including interest rates and collateral as those prevailing at the

time for comparable transactions with other persons and does not involve more than the normal risk of repayment or present other unfavorable features.[1]

12 U.S.C. § 1972(2)(A)-(D) (1994).

When these proscriptions were placed within § 1972, Congress also included subparagraph (F) of § 1972(2), which provided for the imposition of a civil money penalty of up to $1,000 per day against any bank violating any of the proscriptions of § 1972(2)(A)-(D). H.R.Rep. No. 95-1383, *reprinted in* 1978 U.S.C.C.A.N. 9273, 9314 (1978). In its original form, § 1972(2)(F) stated as follows:

> Any bank which violates or any officer, director, employee, agent, or other person participating in the conduct of the affairs of such bank which violates any provision of [§ 1972(2)(A)-(D) ] shall forfeit and pay a civil penalty of not more than $1,000 per day for each day during which such violation continues.

P.L. No. 95-630, 92 Stat. 3690, 3691 (1978) (amended by Financial Institutions Reform, Recovery and Enforcement Act of 1989).

The purpose of the civil money penalty was to deter banks from engaging in the insider activities which injured the banking industry. H.R.Rep. No. 95-1383, *reprinted in* 1978 U.S.C.C.A.N. 9273, 9282-88 (1978). It is undisputed that § 1972(2)(F) in its original form did not create a private right of action.[2]

---

[1]Subparagraph (E) of § 1972(2) states as follows:

> (E) For purposes of this paragraph, the term "extension of credit" shall have the meaning prescribed by the Board pursuant to section 375b of this title and the term "executive officer" shall have the same meaning given it under section 375a of this title.

12 U.S.C. § 1972(2)(E) (1994).

[2]House Report 95-1383 notes that H.R. 13471, the precursor to FIRIRCA, gave federal banking agencies four major tools to assist in enforcing the provisions of FIRIRCA: (1) civil money penalties; (2) improved cease-and-desist authority; (3) improved removal and suspension of insider statutes; and (4) control over changes in control at financial institutions. The House Report does not state that the agencies are also assisted by private enforcement mechanisms such a private rights of action.

> The BHCA was amended a second time in 1982. The 1982 amendment to the BHCA made certain technical changes in the language of the Act and provided for regulations to be issued by the appropriate agencies. The 1982 amendment left intact the prohibition against anti-tying arrangements and correspondent and insider loans and the penalties therefor.

3. *Response to the Savings & Loans Crisis*

Notwithstanding the overhaul in banking laws by FIRIRCA, the American banking industry suffered financial problems again in the early 1980s during the thrift and savings and loan debacle. The acute and massive financial crisis of the thrift industry and the Federal Savings and Loan Insurance Corporation was caused in large part by fraud and more insider abuse. H.R.Rep. No. 101-54(I), 101st Cong., 1st Sess. 294, 300-01, *reprinted in* 1989 U.S.C.C.A.N. 86, 90, 96-97 (1989). Thus, Congress passed the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), P.L. 101-73, 103 Stat. 183. FIRREA amended § 1972(2)(F) to enhance and clarify the enforcement powers of financial institution regulatory agencies by increasing the civil money penalties imposed against banks which violate the provisions of § 1972(2)(A)-(D). H.R.Rep. No. 101-222, 101st Cong., 1st Sess. 440, *reprinted in* 1989 U.S.C.C.A.N. 86, 479 (1989).

The pertinent language of § 1972(2)(F) of the Bank Holding Company Act is entitled "Civil Money Penalty" and provides as follows:

(F) Civil money penalty

(i) First tier. Any bank which, and any institution-affiliated party (within the meaning of section 1813(u) of this title) with respect to such bank who, violates any provision of this paragraph shall forfeit and pay a civil penalty of not more than $5,000 for each day during which such violation continues.

(ii) Second tier. Notwithstanding clause (i), any bank which, any institution affiliated party (within the meaning of section 1813(u) of this title) with respect to such bank *who*—

(I)(aa) commits any violation described in clause (i);

(bb) recklessly engages in an unsafe or unsound practice in conducting the affairs of such bank; or

(cc) *breaches any fiduciary duty;*

(II) which violation, practice or breach—

(aa) is part of a pattern of misconduct;

(bb) causes or is likely to cause more than a minimal loss to such bank; or

(cc) results in pecuniary gain or other benefit to such party,

*shall forfeit and pay a civil penalty of not more than $25,000* for each day during which such violation, practice, or breach continues.

(iii) Third tier. Notwithstanding clauses (i) and (ii), any bank which, and any institution-affiliated party (within the meaning of section 1813(u) of this title) with respect to such bank who—

(I) knowingly—

(aa) commits any violation describe in clause (i);

(bb) engages in any unsafe or unsound practice in conducting the affairs of such bank; or

(cc) breaches any fiduciary duty; and

(II) knowingly or recklessly causes a substantial loss to such bank or a substantial pecuniary gain or other benefit to such party by reason of such violation, practice or breach,

shall forfeit an pay a civil penalty in an amount not to exceed the applicable maximum amount determined under clause (iv) for each day during which such violation, practice or breach, continues.

12 U.S.C. § 1972(2)(F)(i)-(iii) (1994) (emphasis supplied).

The amended version of § 1972(2)(F) increases the civil money penalties and provides that a bank "who breaches any fiduciary duty ... shall forfeit and pay a civil money penalty of not more than $25,000 for each day during which such ... breach continues." Plaintiffs contend that this language in the amended version of § 1972(2)(F) not only provides for the penalty but also creates an affirmative duty on banks not to breach any fiduciary duty and also creates a private cause of action for any customer to sue any bank for any breaches of fiduciary duties. Plaintiffs' argument is without merit for numerous reasons outlined below.

B. *Section 1972(2)(F) Does Not Create A Private Cause Of Action For Breaches Of Fiduciary Duties*

First, § 1972(2)(F) in its current form only enhances the civil money penalties already sanctioned by its predecessor. Section 1972(2)(F), as amended, did not create any cause of action, but instead merely expanded what subparagraph (F) already sanctioned—civil money penalties. Subparagraph (F) in its original form provided for a $1,000 per day penalty for certain violations. Subparagraph (F) as amended provides for only a more elaborate scheme of penalties.

Under the first tier of § 1972(2)(F), banks (and other financial institutions) may incur civil money penalties of up to $5,000 per day for violating any of the provisions of § 1972(2)(A)-(D).

12 U.S.C. § 1972(2)(F)(i) (1994). Under the second tier of § 1972(2)(F), banks may incur civil money penalties of up to $25,000 per day for (a) violating the provisions of § 1972(2)(A)-(D); (b) recklessly engaging in an unsound practice; or (c) breaching any fiduciary duty, if such violation, practice or breach is (1) part of a pattern of misconduct; (2) causes or is likely to cause more than a minimal loss to such bank; or (3) results in a pecuniary gain or other benefit to such party. 12 U.S.C. § 1972(2)(F)(ii) (1994). Under the third tier of § 1972(2)(F), banks can incur civil money penalties of up to $1,000,000 or 1% of the total assets of such bank per day for knowingly (a) violating the provisions of § 1972(2)(A)-(D); (b) recklessly engaging in an unsound practice; or (c) breaching any fiduciary duty, and, knowingly or recklessly causing a substantial loss to such bank or a substantial pecuniary gain or other benefit to such party by reason of such violation, practice or breach. 12 U.S.C. § 1972(2)(F)(iii) (1994).

Second, the legislative history of § 1972 does not indicate an intention to create a private right of action for breaches of fiduciary duties. The legislative history of § 1972 nowhere mentions congressional intent to create a federal cause of action to provide a remedy to parties injured solely as a result of misconduct outlined in the civil money penalty provision of the BHCA. Rather, the only thing the legislative history of the BHCA, and specifically FIRREA, clearly evidences is that in amending subparagraph (F) to provide for the three-tier system of civil money penalties, Congress merely sought to stiffen the deterrent value of the fines Congress previously had sanctioned through the original enactment of subparagraph (F).

Third, the language Congress used in drafting §§ 1972 & 1975 does not support the existence of a private right of action under the BHCA for breaches of fiduciary duties. Plaintiffs' principal argument is based on statutory construction. Plaintiffs claim that the plain language of §§ 1972(2)(F)(ii) & 1975 creates a cause of action because § 1975 creates a cause of action in favor of any person injured by any conduct forbidden in § 1972 and that breaches of fiduciary duties are forbidden in § 1972(2)(F)(ii). However, there is no plain language forbidding any conduct in § 1972(2)(F)(ii). Congress uses prohibitory language in other parts of § 1972. For example, paragraph (1) of § 1972 states: "A bank shall not in any manner extend credit ... on the condition

or requirement...." 12 U.S.C. § 1972(1) (1994). Additionally, the first four paragraphs of § 1972(2) employ the words "no bank shall...." 12 U.S.C. § 1972(2)(A)-(D) (1994).

Plaintiffs do not rely on any of the prohibitions in § 1972(2)(A)-(D) for their claim that Defendant committed prohibited conduct. Instead, Plaintiffs contend that the civil money penalty section of the BHCA not only provides for civil money penalties, but also proscribes the conduct for which the civil money penalties can be imposed. Plaintiff ignores the fact that, unlike § 1972(2)(A)-(D), subparagraph (F) never affirmatively states that no bank shall breach any fiduciary duty. Instead, it just states the penalty for breaches of fiduciary duties. If Congress desired to create a cause of action arising out of the acts contained in § 1972(2)(F)(ii), it is apparent Congress would convey its message that these acts are "forbidden" for purposes of § 1975 through clearer means. Congress would say "no banks shall breach any fiduciary duty." Also, if Congress intended to create a cause of action for breaches of fiduciary duties, it is unlikely that Congress would bury the proscription of such breaches in a section entitled, "Civil Money Penalties."

Fourth, interpreting § 1972 in the manner Plaintiffs suggest runs afoul of the well-established canon of statutory construction that words have the same meaning throughout a given statute. *See Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (noting that different language implies different meaning); *Flight Attendants v. Zipes,* 491 U.S. 754, 758, 109 S.Ct. 2732, 2735, 105 L.Ed.2d 639 (1989) (same); *Neal v. Honeywell, Inc.,* 33 F.3d 860, 863 (7th Cir.1994). Section 1972(2)(F)(ii)(I)(aa) provides that any bank which "commits any violation described in clause (i) ... which violation ... is part of a pattern of misconduct ... or results in pecuniary gain or other benefit to such party, shall forfeit and pay a civil penalty of no more than $25,000 for each day during which such violation, practice, or breach continues." 12 U.S.C. § 1972(2)(F)(ii)(I)(aa) & (II)(cc) (1994).[3] This is the exact same language Plaintiffs rely on in § 1972(2)(F)(ii)(I)(cc) & (II)(cc) for their proposition that § 1972(2)(F)(ii) proscribes breaches of fiduciary duties. The sole distinction between the two provisions is that § 1972(2)(F)(ii)(I)(aa) authorizes civil money penalties for violations described in clause (i), i.e., violations of §

---

[3]The violations described in clause (i) refer to violations of § 1972(2)(A)-(D).

1972(2)(A)-(D), and § 1972(2)(F)(ii)(I)(cc), the provision on which Plaintiffs rely, authorize civil money penalties for breaches of fiduciary duties.  It is clear that § 1972(2)(F)(ii)(I)(aa) does not proscribe anything because the activities for which it sanctions civil money penalties already are prohibited by § 1972(2)(A)-(D).  Since under Plaintiffs' construction of the statute these exact same words in the same clause of § 1972(2)(F) would have two totally different meanings, the Court finds that Plaintiffs' construction of § 1972(2)(F)(ii) is incorrect.

Fifth, the statutory scheme Congress utilized in drafting § 1972 bespeaks loudly to Congress's intention only to create a private right of action arising out of the forbidden conduct contained within the anti-tying provisions of the BHCA, or paragraph (1) of § 1972.  Section 1972 is divided into two paragraphs, both outlining various forms of forbidden conduct.  The conduct in paragraph (1) relates to various tying activities, while the conduct in paragraph (2) relates to various forms of insider activities.  Although § 1975 creates a cause of action for anyone injured by any conduct forbidden in § 1972, it is readily apparent that § 1975 does not apply to the "forbidden" conduct in paragraph (2), because the conduct outlined therein is not the type of conduct which injures individuals.  Any one individual would have difficulty showing that he even has standing to bring a claim based on the "forbidden" conduct contained in § 1972(2).  Thus, instead of using a private right of action as the vehicle through which § 1972(2) is enforced, Congress authorized the sanction of civil money penalties.  The strongest support for this conclusion can be drawn from the fact that the civil money penalties sanctioned in § 1972(2)(F) apply only to conduct "forbidden" in paragraph (2) of § 1972.

Sixth, in discussing the amendment to § 1972(2)(F) of the BHCA, the FIRREA Joint Conference Report states that the purpose of the section was to increase the maximum amount for civil money penalties and to expand the grounds for imposing them, as follows:

> This section increases the maximum amount for civil money penalties ("CMPs"); expands the grounds for imposing them;  provides for judicial review under the Administrative Procedure Act;  and authorizes the banking agencies to take action to collect CMPs.  It creates three tiers of civil penalties, based on the seriousness of the misconduct.  By greatly expanding the scope of misconduct covered by the civil penalty provisions and by making substantial increases to the penalty amounts, the Conferees intend for the Federal banking agencies to aggressively utilize this new authority, whenever it is justified in law and by the facts.

1989 U.S.C.C.A.N. 86, 479 (1989). In other words, § 1972(2)(F) as amended adds breaches of fiduciary duties to the list of conduct for which banks may be subject to paying civil money penalties. Section 1972(2)(F) does not add breaches of fiduciary duties to the list of conduct for which bank customers can sustain a private cause of action.

Considering the foregoing, the clarity of Congress's purpose in amending § 1972(2)(F)(ii) becomes magnified. With the realization that subparagraph (F) is purely the enforcement vehicle of § 1972(2), it becomes clear that by expanding subparagraph (F) Congress intended only to strengthen the penalties banks could incur by committing the acts "forbidden" in § 1972(2)(A)-(D) and to expand the forms of conduct for which civil money penalties can be imposed. Congress did not intend to create a cause of action for the activities contained only in the civil money penalty provision of the BHCA.

Subparagraph (F) as originally enacted did not create a cause of action, but only authorized the sanction of fines against banks which engaged in insider activities. Subparagraph (F) as it currently exists does not create a right of action where one previously did not exist, but only enhanced the fines which already existed. Thus, the Court finds that the legislative history of the BHCA reveals no congressional intent to create a cause of action to private parties arising out of the conduct outlined in § 1972(2)(F)(ii), specifically breaches of fiduciary duties.

C. *Application Of The Cort Factors To The BHCA Supports The Conclusion That Congress Did Not Intend To Create A Cause Of Action For Breaches of Fiduciary Duties*

Additionally, an application of the *Cort* factors supports the conclusion that Congress did not intend to create a cause of action in favor individuals harmed by conduct outlined in the civil penalty provision of the BHCA. In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the United States Supreme Court set out a four-factor test to assist in determining whether Congress intended to create a cause of action in a given statutory provision. The four factors are as follows:

(1) Whether the plaintiff is a member of the class for whose benefit the statute was enacted;

(2) Whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one;

(3) Whether the creation of a cause of action is consistent with the underlying purposes of the legislative scheme to imply such a remedy; and

(4) Whether the cause of action is one traditionally relegated to state law so that it would be inappropriate to infer a cause of action based solely on federal law.

*Id.* at 80-85, 95 S.Ct. at 2089-91. Each of these factors counsels against implying a right of action arising out of the commission of acts outlined in the civil money penalty provision of the BHCA.

First, although breaches of fiduciary duties clearly injure consumers, it is clear from the legislative history of the BHCA that subparagraph (F) of § 1972(2) was designed to curb activities which harmed the banking industry, as opposed to individual consumers. Second, there is absolutely no indication of a legislative intent to create a cause of action. Third, it is apparent that Congress's intent in enacting § 1972(2)(F) was to discourage certain forms of conduct by increasing the civil money penalties applicable to certain kinds of conduct and to expand the scope of conduct which sanctions the imposition of civil money penalties as opposed to creating a cause of action for new forms of conduct. Lastly, causes of action for breaches of fiduciary duties are traditionally creatures of state law, and under *Cort,* it would be inappropriate to infer a cause of action for such based solely on federal law.

For the foregoing reasons, the Court finds that Plaintiff's Complaint fails to state a cause of action under the BHCA, and accordingly, the Court dismisses Plaintiff's claim under the BHCA for lack of subject matter jurisdiction.

## III. *PLAINTIFFS' STATE LAW CLAIMS*

Plaintiffs' only remaining claims against Defendant are state law claims. The Court *sua sponte* may raise a jurisdiction defect at any time. *Barnett v. Bailey,* 956 F.2d 1036, 1039 (11th Cir.1992); *Fitzgerald v. Seaboard System R.R., Inc.,* 760 F.2d 1249, 1251 (11th Cir.1985). The Court, *sua sponte,* will examine whether it continues to have jurisdiction over this action.

Since Plaintiffs are Georgia domiciliaries and Defendant is a Georgia corporation, diversity does not exist. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Thus, there is no basis for original federal jurisdiction over Plaintiffs' state law claims against Defendant. The state law claims previously were before the court properly as supplemental claims supported by Plaintiffs' federal question claim. *See* 28 U.S.C. § 1367(a) (1994). However, with the dismissal of Plaintiffs' federal claim, there remains no independent original federal jurisdiction to support the

Court's exercise of supplemental jurisdiction over the state claims against Defendant.

The Court must now inquire into whether a jurisdictional basis exists to support Plaintiffs' state law claims in federal court. The Court's inquiry is twofold. First, the Court must decide whether it has the power to hear the state law claims. Second, if the Court does have the power to hear the state claims, the Court must decide whether, in its discretion, it will retain jurisdiction over the state claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725-26, 86 S.Ct. 1130, 1138-39, 16 L.Ed.2d 218 (1966).

The question whether subject matter jurisdiction exists is measured as of the time the Complaint was filed. *In re Carter,* 618 F.2d 1093 (5th Cir.1980), *cert. denied sub nom. Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Carter,* 450 U.S. 949, 101 S.Ct. 1410, 67 L.Ed.2d 378 (1981). When Plaintiffs filed their Complaint, Plaintiffs were Georgia domiciliaries and Defendant was a Georgia corporation. When Plaintiffs filed his Complaint, Plaintiffs had a federal question claim against Defendant and Plaintiffs' state law claims against Defendant were a proper exercise of the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a) (1994); *see also Palmer v. Hospital Authority of Randolph County,* 22 F.3d 1559, 1567 (11th Cir.1994). The dismissal of Plaintiffs' underlying federal question claim does not deprive the Court of supplemental jurisdiction over the remaining state law claims. *See Palmer,* 22 F.3d at 1568; *Edwards v. Okaloosa County,* 5 F.3d 1431, 1433-35 (11th Cir.1993). Indeed, under 28 U.S.C. § 1367(c), the Court has the discretion to decline to exercise supplemental jurisdiction over non-diverse state law claims, where the Court has dismissed all claims over which it had original jurisdiction, but is not required to dismiss the case. *See Palmer,* 22 F.3d at 1567-68.

As the Eleventh Circuit made clear in *Palmer,* once a court decides that it has power to exercise supplemental jurisdiction under § 1367(a), then the court should exercise that jurisdiction, unless § 1367(b) or (c) applies to limit the exercise.[4] In this case, § 1367(c) applies because the

---

[4] 28 U.S.C. § 1367 codifies the traditional concepts of ancillary and pendent jurisdiction under the name supplemental jurisdiction. Simply explained, § 1367(a) grants the federal judiciary congressional approval to extend supplemental jurisdiction to the limits of the Constitution. Section 1367(b) and (c) reduce that grant.

Court "has dismissed all claims over which it has original jurisdiction;" namely, Plaintiffs' claim against Defendant under the Bank Holding Company Act. *See* 28 U.S.C. § 1367(c) (1994). While § 1367(c) permits a court to dismiss any state law claims where the court has dismissed all the claims over which it had original jurisdiction, the court also can consider other factors. Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction. *See Palmer,* 22 F.3d at 1569; *Executive Software N. Am. v. United States Dist. Court,* 15 F.3d 1484, 1493 (9th Cir.1994); *New England Co. v. Bank of Gwinnett County,* 891 F.Supp. 1569, 1578 (N.D.Ga.1995); *Fallin v. Mindis Metals, Inc.,* 865 F.Supp. 834, 841 (N.D.Ga.1994).

Resolution of Plaintiffs' state law claims depends on determinations of state law. State courts, not federal courts, should be the final arbiters of state law. *Hardy v. Birmingham Bd. of Educ.,* 954 F.2d 1546, 1553 (11th Cir.1992). When coupled with the Court's discretion to exercise supplemental jurisdiction under § 1367(c), this Court finds that the state law claims remaining in this action are best resolved by the Georgia courts. This is especially true here where the Court is dismissing Plaintiffs' federal law claim prior to trial. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (dismissal of state law claims strongly encouraged when federal law claims are dismissed prior to trial); *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988) ("When federal law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *Eubanks v. Gerwen,* 40 F.3d 1157 (11th Cir.1994) (remanding case to district court to dismiss plaintiff's state law claims where court had granted summary judgment on plaintiff's federal law claims). The Court finds that judicial economy, fairness, convenience, and comity dictate having these state law claims decided by the state courts.

IV. *CONCLUSION*

For the foregoing reasons, the Court GRANTS Defendant's Motion to Dismiss [3-1] Plaintiffs' claim under the BHCA for want of subject matter jurisdiction. The Court DISMISSES

Plaintiff's state law claims WITHOUT PREJUDICE.

The Clerk is directed to enter final judgment in favor of Defendant on Plaintiffs' claim under federal law.  The Clerk is directed to dismiss Plaintiffs' claims under state law.

It is SO ORDERED, this 28th day of November, 1995.

/s/ Frank M. Hull

Frank M. Hull

United States District

Judge