F I L E D
United States Court of Appeals
Tenth Circuit

OCT 6 1997

PATRICK FISHER
Clerk

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

GARRETT R. QUINTANA, SR.,

    Plaintiff-Counter-Defendant-
Appellant,

    v.

FIRST NATIONAL BANK OF
SANTA FE,

    Defendant-Counter-Claimant-
Appellee.

No. 96-2165
(D.C. No. CIV-92-714 BB/WWD)
(D. N.M.)

ORDER AND JUDGMENT[*]

Before BRISCOE, McWILLIAMS, and LUCERO, Circuit Judges.

Plaintiff Garrett R. Quintana, Sr., (Quintana Sr.) filed this action against

defendant First National Bank of Santa Fe (First National), claiming First

National violated the anti-tying provisions of the Bank Holding Company Act

(BHCA), 12 U.S.C. § 1972, by requiring, as a condition of loaning him

approximately $1.7 million in September 1989, that Quintana Sr. pay off a

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

defaulted $211,500 loan First National had made earlier to Quintana Sr.'s son, Garrett Quintana, Jr. (Quintana Jr.). Following a bench trial, the district court found in favor of First National. Quintana Sr. appeals and we affirm.

I.

Quintana Sr. is a real estate developer and investor who has been involved in a number of projects in Santa Fe, New Mexico. He generally financed his real estate activities through loans from financial institutions, including First National. Quintana Jr. was also involved in the real estate development business, and was an officer, director, and employee of Bonanza Realty, Inc., a real estate agency wholly owned by Quintana Sr.

In 1984, Quintana Sr. entered into an agreement to purchase the Sears Building in downtown Santa Fe. In light of outstanding loans on other projects, he decided he should not personally obtain the financing and he turned the project over to Quintana Jr., who had recently graduated from college. With the assistance of his father, Quintana Jr. sought financing for the project from First National. Quintana Jr. submitted a financial statement to First National in August 1984 reflecting a personal net worth of over $2.2 million, based primarily on real estate holdings at 1533 and 1599 St. Francis Drive and 1975 Cerrillos Road. First National agreed to loan Quintana Jr. $450,000 to finance the purchase of the building; in return, First National asked for mortgages and collateral assignments

of rents and leases on the St. Francis and Cerrillos properties. Notably, the St. Francis and Cerrillos properties were actually owned by Quintana Sr. and were not conveyed to Quintana Jr. until September 4, 1984, the date on which Quintana Jr. executed the mortgages and collateral assignments in favor of First National. The following day, Quintana Jr. conveyed the St. Francis and Cerrillos properties back to Quintana Sr. without the knowledge of First National. A portion of the loan proceeds ($180,000) was used to pay a real estate commission to Grubesic Realty, which then split the commission with Quintana's wholly-owned real estate agency, Bonanza Realty.

In 1985, First National offered to sell Quintana Jr. a piece of property known as Calle Lorca. Quintana Jr. and Quintana Sr. participated in negotiations for the purchase and financing of the property. Ultimately, First National loaned Quintana Jr. $211,500 to finance acquisition of the Calle Lorca property. In 1986, disputes arose regarding an easement at Calle Lorca, as well as a commitment First National had allegedly made to loan additional sums to Quintana Jr. to develop the property. Both Quintana Sr. and Quintana Jr. threatened to sue First National.

Quintana Sr. located a piece of property with the potential of being developed into a trailer park in 1985. Quintana Jr. and C.L. Brown, a friend of Quintana Sr., formed the Vista Verde partnership and obtained a $355,000 loan

from First National to purchase the property. Quintana Jr. borrowed money from Quintana Sr. to use as his capital contribution to the project. Although Quintana Sr. was not a partner or a party to the loan, he participated in negotiations with First National for the loan and later contended First National had made a commitment to fund the development and acquisition of the proposed Vista Verde Mobile Home Park. As he had with the Calle Lorca loan, Quintana Sr. threatened to sue First National over its perceived failure to provide additional financing. By 1987, Quintana Jr. and Brown had ceased making interest payments on the loan. The parties eventually resolved the situation by Brown personally executing a new promissory note to First National, First National assigning the original Vista Verde note to Brown, and Quintana Sr. personally guaranteeing payment of the original Vista Verde note.

In 1989, Quintana Jr. presented First National with another financial statement reflecting that he owned the St. Francis and Cerrillos properties. More specifically, the financial statement reflected that Quintana Jr. owned the asset values, income, and associated expenses on these properties. However, at the same time, Quintana Sr. was claiming the income, depreciation, and associated expenses for these properties on his federal tax returns.

By June 1, 1989, Quintana Jr. had failed to pay his Calle Lorca note to First National, creating a default under the provisions of the Sears loan agreement

(which characterized a failure to pay any other debt or obligation to First National as a default of the Sears loan agreement), placing at risk all of the real property pledged to secure the Sears loan agreement (i.e., the St. Francis and Cerrillos properties). Quintana Sr. approached First National and offered to pay Quintana Jr.'s defaulted Calle Lorca loan and resolve all of the disputes if First National would agree to finance the acquisition and planning costs for 320 acres of undeveloped land northwest of Santa Fe called Vista del Monte. First National accepted the offer and ultimately loaned him $1,762,000. In addition to acquisition funds for the land, the loan provided funds for engineering, an interest reserve, and $211,500 to pay off Quintana Jr.'s defaulted Calle Lorca loan. First National subsequently extended the Vista del Monte loan on three separate occasions at the request of Quintana Sr. On May 13, 1992, more than seven months after the Vista del Monte loan was due, First National issued a notice of sale and a notice of default and election to sell the real property securing the loan. Quintana Sr. subsequently sold the land and paid the loan in full.

Quintana Sr. filed this action on July 9, 1992, alleging the Vista del Monte loan agreement violated the anti-tying provisions of the BHCA. The district court initially granted summary judgment in favor of First National on the grounds that the evidence presented was insufficient to raise a factual dispute concerning whether First National's practices were unusual or anticompetitive (as required by

the BHCA).  Quintana Sr. appealed and we reversed and remanded for further proceedings.  Quintana v. First Nat'l Bank, 64 F.3d 670, 1995 WL 490276 (10th Cir. 1995) (table).  In so doing, we concluded (1) there were factual disputes concerning whether Quintana Sr. and Quintana Jr. were "related" customers for lending purposes, and (2) the district court improperly disregarded two expert opinions proffered by Quintana Sr.  On remand, the district court conducted a bench trial on the BHCA claim and found in favor of First National, concluding the Vista del Monte loan agreement did not violate the anti-tying provisions of the BHCA.

## II.

The purpose of the BHCA, as originally enacted in 1956, "was the regulation of the power of bank holding companies to prevent a small number of powerful banks from dominating commerce and to ensure a separation of economic power between banking and commerce."  Baggett v. First Nat'l Bank, 117 F.3d 1342, 1345 (11th Cir. 1997).  "In 1970, Congress amended the Act to reach the anti-competitive practices of even smaller banks, which notwithstanding their comparative size, were able to exert economic power over businesses because of their control over credit."  Id.  Specifically, Congress amended the Act

by adding 12 U.S.C. § 1972(1), which prohibited certain tying arrangements.[1] In

pertinent part, that section provides:

> A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement
> . . .
> (C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

12 U.S.C. § 1972(1)(C) (1994).

To demonstrate a violation of § 1972(1)(C), a plaintiff must prove the

condition placed on the loan is (1) an unusual banking practice, (2) an

anticompetitive tying arrangement, and (3) a practice that benefits the bank.

Parsons Steel, Inc. v. First Alabama Bank, 679 F.2d 242, 245-46 (11th Cir. 1982);

accord Palermo v. First Nat'l Bank & Trust Co., 894 F.2d 363, 368 (10th Cir.

1990). In Palermo, we held it is not an unusual banking practice for a lender to

"evaluate its entire existing relationship" with a customer, including the

"customer's related loans," when deciding whether to renew existing credit or

extend new credit. Id. at 369-70. Nor is it an unusual practice, we held, for a

bank to require a customer to guarantee affiliated debt before extending further

---

[1] In conjunction with § 1972, Congress enacted § 1975 of the BHCA, creating a private right of action in favor of individuals harmed by violations of the anti-tying provisions of the BHCA. Baggett, 117 F.3d at 1345-46.

credit. However, we held, this exemption does not extend to a situation where the lender conditions the extension of credit to a customer "on the requirement that the customer participate in the bank's bad loans to an unrelated customer." Id. at 369.

The initial question on appeal is whether the district court erred in finding Quintana Sr. and Quintana Jr. are related customers. If the court's finding on this matter is correct, then the condition challenged by Quintana Sr. (i.e., that he pay off his son's Calle Lorca loan in return for receiving the Vista del Monte loan) was a typical banking practice not prohibited by the BHCA. We review the district court's factual findings for clear error. See Curry v. United States, 97 F.3d 412, 414 (10th Cir. 1996). A finding of fact is clearly erroneous if it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made. Heim v. Utah, 8 F.3d 1541, 1543 (10th Cir. 1993).

In paragraphs 8 through 27 of its findings of fact, the district court outlined the financial affairs, assets, liabilities, and borrowing of Quintana Sr. and Quintana Jr. Considered together, those findings clearly indicate Quintana Sr. and his son repeatedly manipulated their joint assets in order to obtain funding from First National for various real estate projects. More specifically, the findings suggest Quintana Sr. and Quintana Jr. used one another as conduits for

obtaining financing they otherwise would have been unable to achieve on their own. In addition, the findings indicate Quintana Sr. had substantial influence, if not complete control, over his son's real estate projects. In particular, he was routinely involved in the development and financing of his son's real estate projects, as well as with his son's post-loan dealings with First National. Based upon these collective factual findings, which are amply supported by the record on appeal, we conclude the court did not commit clear error in finding Quintana Sr. and Quintana Jr. were affiliated or related borrowers.

In addition to challenging the sufficiency of the evidence underlying the district court's factual findings, Quintana Sr. also contends the district court erred by ignoring applicable federal regulations governing the banking industry. Specifically, he argues the court failed to follow 12 C.F.R. § 32.5, which sets forth guidelines a bank must use in determining whether loans or extensions of credit to one borrower will be attributed to another person for lending limit purposes.

Because the record on appeal fails to demonstrate that this issue was presented to and decided by the district court, we decline to decide it on appeal. See Wilson v. Union Pac. R.R. Co., 56 F.3d 1226, 1233 (10th Cir. 1995). Although Quintana Sr. cites to trial testimony in which a witness discusses the regulation, he cites to no portion of the record in which his counsel argued to the

-9-

district court (either at trial or by written motion) that it must consider the regulation in determining whether Quintana Sr. and his son were related borrowers. Likewise, the record contains no indication that the court considered the issue at all.

Even assuming the issue was properly raised below, it has no merit. The portions of the regulation quoted and relied upon by Quintana Sr. are from the most recent version of the regulation. Notably, that version became effective in March 1995, approximately six years after the loan at issue was made. Although a similar regulation was in place at the time of the loan, it was less detailed than the newer version cited by Quintana Sr. Both versions of the regulation indicate loans to one person will be attributed to another person when the proceeds of the loan are used for the "direct benefit" of the other person; however, the older version of the regulation, unlike the newer version, did not define the term "direct benefit." Kenneth J. Rojc, National Bank Lending Limits--A New Framework, 40 Bus. Law. 903, 919-20 (May 1985). Thus, it is arguable that the older version would apply to a wider variety of circumstances and could arguably encompass the facts in this case. See id. at 920 (suggesting the Comptroller would interpret the term "direct benefit" in a flexible manner). Similarly, although both versions of the regulations mandate attribution where the persons involved are deemed to be involved in a "common enterprise," the older version of the regulation is far

less detailed in defining the term "common enterprise." Id. at 920-21. For these reasons, it is conceivable Quintana Sr. and Quintana Jr. would have been considered affiliated or related borrowers under the older version of the regulation. Finally, even if the new regulation were applicable, it is possible that Quintana Sr. and his son would fall within the catch-all provision of the "common enterprise" definition. See 12 C.F.R. § 32.5(c)(4) (noting a common enterprise will be deemed to exist "[w]hen the OCC determines, based upon an evaluation of the facts and circumstances of particular transactions, that a common enterprise exists"). Accordingly, the court's conclusion that Quintana Sr. and Quintana Jr. are related borrowers is not inconsistent with the provisions of § 32.5.[2]

Because we conclude the district court did not err in finding Quintana Sr. and Quintana Jr. were related borrowers for purposes of the BHCA, we find it unnecessary to address the remaining issues raised on appeal.

### III.

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[2] We reach no decision with respect to whether the district court was required to consider § 32.5 in determining whether Quintana Sr. and his son were related borrowers.