Sabrina J. **FLIPPO**, Plaintiff

v.

**AMERICAN POWER SOURCE, INC., et al.,** Defendants.

**Case No. 6:12–cv–03500–MHH.**

United States District Court, N.D. Alabama, Jasper Division.

Signed May 12, 2014.

John V. Martine, John V. Martine, Winfield, AL, Tim R. Wadsworth, Tim R. Wadsworth Law Offices PC, Sulligent, AL, for Plaintiff.

Christopher L. McIlwain, Hubbard McIlwain & Brakefield PC, Tuscaloosa, AL, for Defendants.

### MEMORANDUM OPINION

MADELINE HUGHES HAIKALA, District Judge.

On April 18, 2014, the magistrate judge's report and recommendation was entered and the parties were allowed therein fourteen (14) days in which to file objections to the recommendations made by the magistrate judge. No objections to the magistrate judge's report and recommendation have been filed by plaintiff or defendants.

After careful consideration of the record in this case and the magistrate judge's report and recommendation, the court hereby ADOPTS the report of the magistrate judge. The court further ACCEPTS the recommendations of the magistrate

judge that the motion for summary judgment filed by defendant be granted as to Counts One (Title VII sexually hostile environment), Two (Title VII sex discrimination) and Four (Title VII retaliation), and these claims dismissed with prejudice. The courts also accepts the recommendations of the magistrate judge that the court decline to exercise supplemental jurisdiction over Counts Three (negligent hiring, training, supervision and retention), Five (invasion of privacy), Six (assault and battery) and Seven (outrage), and that these claims be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c).

## *REPORT AND RECOMMENDATION*

HARWELL G. DAVIS, III, United States Magistrate Judge.

The above-entitled civil action is before the court on the motion for summary judgment filed by defendants. (Doc. 15). Plaintiff, Sabrina J. Flippo, has filed suit against defendants, American Power Source, Inc. (APS) and Altino Arruda. Plaintiff alleges that APS violated Title VII by requiring that she work in a sexually hostile environment (Count One), discriminated against her on the basis of her sex (Count Two), and retaliated against her when she complained about this treatment (Count Four). She also alleges that APS is guilty of the state law tort of negligent hiring, training, supervision and retention of her alleged harasser, co-defendant Altino Arruda (Count Three). Plaintiff further alleges that Arruda is guilty of invasion of her privacy (Count Five) and assault and battery (Count Six) under Alabama law. Finally, she alleges that Arruda committed the state law tort of outrage against her and that APS subsequently ratified this conduct (Count Seven). *See* Doc. 1, Complaint.

Defendants filed an answer denying plaintiff's claims. (Doc. 4, Answer). In addition, defendants filed a motion for summary judgment, including evidentiary submissions. (Doc. 15, Motion for Summary Judgment). Plaintiff filed a response to this motion, also containing evidentiary submissions. (Doc. 16, Response in Opposition). Defendants subsequently filed two replies to plaintiff's response. (Docs. 17 & 18). The matter is now ready for disposition.

### STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) (Dec. 2010). Rule 56(c) provides:

(1) **Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) **Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) **Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.

(4) **Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c) (Dec. 2010).

Defendants, as the parties seeking summary judgment, bear the initial responsibility of informing the district court of the basis for their motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). A genuine issue of material fact is shown when the nonmoving party produces evidence so that a reasonable factfinder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.,* 498 F.3d 1258, 1263 (11th Cir.2007). If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. In reviewing whether the nonmoving party has met her burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in her favor. *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 998–99 (11th Cir.1992) (internal citations and quotations omitted). However, speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1181 (11th Cir.2005). A "mere scintilla of evidence" in support of the nonmoving party also cannot overcome a motion for summary judgment. *Young v. City of Palm Bay,* 358 F.3d 859, 860 (11th Cir.2004).

FACTUAL BACKGROUND

Defendant APS is a business which cuts and sews clothing items in a building in Fayette, Alabama. Plaintiff, Sabrina Flippo, worked as a bundler for APS. Her most recent employment began in 2008 and ended in March of 2011. (Flippo Depo. at 35). The role of a bundler is to sort, bundle, "shade mark," and tag parts of fabric that have been cut so that they can be taken to the sewing department to be sewn together as garments. (*Id.* at 32–33, 61–87, 93, 98, 109–12, 115–17, 266; Taylor Depo. at 18–19, 21, 26–27, 32).

During most of her employment with APS, Flippo was supervised by Altino Arruda. Arruda was the Spreader Supervisor and the Bundler Supervisor. (Flippo Depo. at 118). The plant manager was Bonnie Taylor. Flippo believes that Taylor did a good job as manager of this APS facility. (*Id.* at 130–31). Flippo is also aware that APS had a sexual harassment policy in place during the time that she worked there. (*Id.* at 138). She testified that she has been aware of the policy ever since she began work there. (*Id.* at 145). She was provided a copy of the policy in 2006. (*Id.* at 146). The policy states that, if an employee believes he or she is the subject of harassment, the employee is to inform the plant manager. (*Id.* at 147).

Flippo was involved in a romantic relationship with Arruda from October 2008 until June or July 2009. (*Id.* at 152, 178, 247). According to Flippo, the relationship was consensual. (*Id.* at 176). In her deposition testimony, Flippo states that, when plant manager Bonnie Taylor found

out about her relationship with Arruda, Taylor discouraged it and told plaintiff she should "nip it in the butt." (*Id.* at 188–89).

Flippo acknowledges that she had sexual relations with Arruda. Initially, she claimed that she only had sex with Arruda on one occasion. (*Id.* at 167). However, she later admitted that her relationship with him was more involved. (*Id.* at 241–42). Flippo admitted that she stayed overnight at Arruda's residence on about ten occasions and may have stayed over on consecutive nights on occasion. (*Id.* at 184–86). According to Flippo, it was her decision to spend time with Arruda and that he never threatened her job or told her that she would lose her job if she did not continue to have a relationship with him. (*Id.* at 179, 180, 187).

Despite Taylor's attempt to discourage plaintiff's relationship with Arruda, which occurred in January 2009, plaintiff continued with it for several more months. (*Id.* at 194). She told Taylor that Arruda knew how to "wine and dine" a woman. (*Id.* at 196–97).

Eventually, Flippo ended the relationship. She testified that she told Arruda she was not going to be coming to his house any more and would be spending time tending to her sick mother. (*Id.* at 214). Flippo testified that Arruda offered to come over to her mother's house and sit there with her. (*Id.*). She believes that he just wanted to be with her all the time. (*Id.* at 208–09). Flippo testified that when she declined, Arruda got mad and said that he did not understand. However, he did not yell or scream at her. (*Id.* at 218, 219).

Flippo testified that, after she broke up with Arruda, she tried to stay friends with him. She took him to the airport on a couple of occasions. (*Id.* at 227). At her request, he also helped Flippo and her niece move a new set of mattresses in his

truck in January 2011. (*Id.* at 222, 225). He also put some underpinnings on her house in 2010, again at her request. (*Id.* at 221, 225–26). Flippo testified that after the breakup, Arruda continued to ask her to go out with him, beginning in August 2009, right after she broke up with him. She continued to tell him "no." (*Id.* at 246–47). However, in October 2009, plaintiff's pay was raised to $11.00 an hour. According to Flippo, Arruda requested that she be given the raise. (*Id.* at 149–50, 300–01).

In addition to continuing to ask her out, Flippo testified that Arruda harassed her on the floor of the shop. She stated that, if she had to go fix something out on the floor, Arruda would come over and curse her and tell her that she had to do things his way. (*Id.* at 251). According to Flippo, on one such occasion, she was called over to the sewing department by Janet Curry because some collars that they had received were cut too small and would not fit the garments to which they were being sewn. (*Id.* at 265–66, 268). Curry called Flippo despite the fact that Arruda was supervisor over the cutting department. (*Id.* at 268–69). Flippo decided that the collars would need to be re-cut. (*Id.* at 271).

Flippo testified that she then went to the cutting department to look for the pattern that had been cut. Arruda came up to her and asked her what she was doing. She told him that the collars were "messed up." According to Flippo, Arruda got upset and told her to go back and tell Janet Curry that Flippo did not run his department and that, if Curry had a problem, she needed to bring it to him. (*Id.* at 272).

After this incident and after having been asked out by Arruda, Flippo testified that she told Bonnie Taylor that Arruda had

asked her out and she wanted Taylor to know that her relationship with Arruda was over. Her exchange with counsel for defendants was as follows:

> Counsel: And at that point in time, I take it you weren't complaining to her, you were just telling her that he had asked you out again and you wanted her to know that y'all's relationship was over, just like she had told you to get it over with earlier in the year, correct?
>
> Flippo: Yes.

(*Id.* at 276).

The next problem that Flippo had with Arruda involved the cutting of some pockets. Not enough were cut. She told this to Arruda, and he got angry and said that she was wrong. Flippo went to Taylor and reported that she did not have enough pockets to complete the manufacturing run. Subsequently, Taylor came to the cutting department and told them that Flippo was correct. She told Arruda to cut more pockets. According to Flippo, Arruda was angry because he had to cut more pockets. (*Id.* at 276–78, 294).

Flippo was asked what else, besides Arruda asking her out, the incident involving the collars and the incident involving the pockets, did she recall in the way of harassing behavior by Arruda between August or September of 2009 and the end of 2009. According to Flippo, there were different things that happened, but they were "not right on top of [her] head" at that time. (*Id.* at 294–95). She recalled that there was an incident involving an employee named Rachel Watson that occurred in 2010, but she could not recall any others that occurred in 2009. (*Id.* at 299).

Flippo testified that she received a raise in pay in October 2009 at Arruda's request. She believes that Arruda got her the raise so that she would go out with him again. After this occurred, he asked her, "Since you got your raise now, are you going to go out with me again?" (*Id.* at 307). She told him, "No." (*Id.* at 308). According to Flippo, Arruda asked her out more than five times but she is unsure if it was more than ten times. (*Id.* at 309). When they were dating, Arruda had problems with erectile dysfunction. She testified that, after she stopped going out with him, when he would ask her out, he would make comments to her that things would be "better" because he was getting Viagra. According to Flippo, Arruda made references to Viagra on several occasions after he first mentioned it near the end of 2009. (*Id.* at 323–24, 329, 332–33). On one occasion, Arruda made a reference to Viagra and told Flippo that he could now "make that cunt talk back to me." (*Id.* at 368–69). Flippo stated she thinks that Arruda believed she would no longer have a relationship with him because of his sexual problem. (*Id.* at 334, 378).

Flippo testified that she went to Taylor to complain about ten or fifteen times about Arruda, about work issues with Arruda, and about his repeatedly asking her out. However, when asked about how many times during 2009 she went and specifically complained to Taylor about him asking her out, she stated, "I will say a couple of times I went to her and asked her for a conference with Roxanne because I had about all I could handle of it." (*Id.* at 316). According to Flippo, when she refused to go out with Arruda, he made things harder for her in the workplace. (*Id.* at 321).

Flippo also testified that there were several occasions in 2010 when she was working at a table when Arruda, who also was working in the area, would walk behind her. There was a wall close behind her, and Arruda would brush up against her when he would walk past her. According to Flippo, Arruda easily could have avoided this by walking around to the other side

of the table. He did it a second time on the same day that he first did this. (*Id.* at 336, 339, 346). Probably a month later, he did this again. According to Flippo, he did this about four more times. (*Id.* at 348–49). Flippo asked Arruda to walk on the other side of the table. Arruda said he could walk on either side. (*Id.* at 439–41). She asked him to stop brushing up against her, and he told her that he "had to get by." (*Id.* at 441).

Flippo also complained that Arruda stared at her a lot and gave her "hateful" looks. (*Id.* at 352–57). However, he never physically threatened her. (*Id.* at 370). He also never touched her breasts or between her legs after their breakup. (*Id.* at 372–73). Furthermore, although Arruda made remarks about Viagra, she never reported these remarks to Bonnie Taylor because she "felt no need to bring that up." (*Id.* at 373).

On another occasion, Flippo went outside to talk on her cell phone. Cell phones were not allowed in the work area. However, Flippo had Taylor's permission to have one because her mother was sick. When she went out the back door, Arruda pushed it open, striking her with it on her left shoulder. He asked her what she was doing. Although the door struck her on the shoulder, it did not leave a bruise or injure her in any way. (*Id.* at 367–68).

In the summer of 2010, Flippo testified that she was working on an assignment and did not have all the parts that were needed for the first couple of sizes, so she skipped to the middle sizes to keep those doing the sewing busy. Rachel Watson complained to Arruda about Flippo doing this. (*Id.* at 301–03). Arruda took this complaint to Bonnie Taylor. Taylor called Flippo into her office to ask her what was going on. Flippo advised her of what she had done and why, and Taylor stated that this procedure was correct. Taylor then called Arruda in and told them both that she was making Flippo the lead person in the bundling department because she knew what to do to keep the sewers going. Watson was upset by this and quit. (*Id.* at 304–05). According to Flippo, Taylor told Arruda and her that she was going to try to stop the problems between Flippo and Arruda and instructed Arruda that Flippo was to come directly to her (Taylor) if she had a problem, rather than taking it to Arruda. (*Id.* at 393). Flippo understood this to mean that, if she had an issue with the spreaders or cutters (supervised by Arruda), she was to go directly to Taylor, rather than taking it to the spreaders or cutters themselves. (*Id.* at 394).

Flippo testified that she subsequently was terminated by Bonnie Taylor for going directly to a cutter instead of going through Arruda. (*Id.* at 395–96). On the day that Flippo was terminated, there was a problem with some pockets that had been cut. Flippo needed them to be re-cut. Rather than taking the problem to Arruda or directly to Taylor, Flippo went directly to the cutter, Jimmy, to get the pockets re-cut. Arruda got angry at this and complained to Taylor. Taylor called Flippo in and told her that she was being terminated for taking the re-cut directly to Jimmy without going through Arruda to do it. Taylor told her that Arruda was the cutting room supervisor and that was the way it was, so she was being terminated. (*Id.* at 395–96).

Even though Taylor had told Flippo to go through her if she had an issue with someone in Arruda's department, she admits she did not do so on this occasion. According to Flippo, she went directly to Jimmy because she did not have an "issue," she just wanted something re-cut. (*Id.* at 396–400). Because she went directly to the cutter, rather than going through Arruda or Taylor, Flippo was terminated

by Taylor for insubordination. (*Id.* at 411–12, 414).

Flippo admits that she has no evidence that Taylor terminated her because of her race, age, or sex. (*Id.* at 421). She acknowledges that whenever she had an issue with Arruda, Taylor would investigate it fully and, up to the last day when she was terminated, always took action favorable to her, except for not allowing her a conference with Roxanne, a customer in Massachusetts. (*Id.* at 437–38; *see id.* at 401). She testified that she never asked Taylor to fire Arruda or to transfer or reassign her or Arruda in some way. Other than being unable to talk to Roxanne, she could not state anything that Taylor failed to do that Flippo asked her to do or wanted her to do. (*Id.* at 438–39).

## DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In evaluating Title VII claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and by the Eleventh Circuit in *Willis v. Conopco, Inc.,* 108 F.3d 282, 284–85 (11th Cir.1997). Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 253–54 & n. 6, 101 S.Ct. at 1093–94 & n. 6. Once a *prima facie* case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. If a defendant carries its burden of producing legitimate, nondiscriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff at all times retains the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff. *Id.* at 253, 101 S.Ct at 1093.

The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." *Burdine, supra,* at 253, 101 S.Ct., at 1093. In other words, is "the employer ... treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977). The *prima facie* case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco, supra,* 438 U.S., at 577, 98 S.Ct., at 2949. Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the

plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff." *Burdine, supra,* 450 U.S., at 253, 101 S.Ct., at 1093.

*U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

### Count One—Sexually Hostile Environment

 In Count One, plaintiff alleges that she was forced to work in a sexually hostile work environment. The Eleventh Circuit set forth in *Mendoza v. Borden, Inc.,* 195 F.3d 1238 (11th Cir.1999) (*en banc*), the elements that an employee must establish to support a hostile environment claim under Title VII based on harassment. An employee must establish: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Id.* at 1245.

 Requiring a plaintiff to prove that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment is necessary to ensure that Title VII does not become a mere "general civility code." *Faragher v. City of Boca Raton,* 524 U.S.

775, 788, 118 S.Ct. 2275, 2283–84, 141 L.Ed.2d 662 (1998). This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment.'" *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 583 (11th Cir.2000) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)).

 In order to establish this factor, a plaintiff must not only establish that she subjectively perceived the environment as hostile and abusive, but also that such a perception is objectively reasonable; that is, that a reasonable person would perceive the environment to be hostile and abusive. *See Mendoza,* 195 F.3d at 1246; *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2284.

 Regarding the objective prong of this element, the statements and conduct complained of are examined collectively to determine whether they are sufficiently pervasive or severe to constitute sexual harassment. *See Mendoza,* 195 F.3d at 1242. In undertaking this analysis, the court will assume that the conduct and statements made by Arruda concerning Viagra were of a sexual nature.[1]

 When the complained-of conduct or statements are of a sexual or gender-related nature, there are four factors that are considered in determining whether they are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms and conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the

---

**1.** Before they are considered in determining whether the severe or pervasive requirement is met, the statements and conduct must be of a sexual or gender-related nature. *Mendoza* at 1245.

conduct is physically threatening or humiliating, or merely an offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza,* 195 F.3d at 1246.

■ Although the actions recounted by plaintiff were undoubtedly annoying and offensive, many decisions throughout the circuits have rejected sexual harassment claims based on actions that are as serious or more serious than the conduct at issue here. *See Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872–75 (5th Cir.1999) (holding that several instances over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support a hostile environment claim); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998) (holding that statement that plaintiff had the "sleekest ass" in the office, plus a single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of plaintiff's employment); *Adusumilli v. City of Chicago,* 164 F.3d 353, 357 (7th Cir.1998) (holding actions insufficient to support a hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeatedly stared at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1365–66 (10th Cir.1997) (holding five sexually-oriented, offensive statements over 16 months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can."); *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 753–54 (4th Cir.1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish Title VII violation); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 823–24 (6th Cir.1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns;" suggesting that land area be named as "Titsville" or "Twin Peaks;" asking plaintiff; "Say, weren't you there [at biker bar] Saturday night dancing on tables?"; stating, "Just get the broad to sign it;" telling plaintiff she was "paid great money for a woman"); *Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir.1993) (holding plaintiff's claims—supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blond, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once in a bar and twice at work—were not sufficient for actionable sexual harassment); *see also Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 263 (5th Cir.1999), ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long-lasting, unredressed, and uninhibited sexual threats or conduct that permeated the

plaintiff's work environment."). Furthermore, mere "sex talk," without more, does not rise to the level of objectively severe and pervasive harassment. *See, e.g., Adusumilli*, 164 F.3d at 357 (holding the plaintiff failed to make out a *prima facie* case of sexual harassment where her co-workers teased her and made sexual jokes aimed at her); *Black*, 104 F.3d at 823–2 (holding male employee's comments and jokes in female plaintiff's presence were not sufficiently severe or pervasive to constitute an objectively hostile work environment).

An examination of the factors set out above reflects that Flippo did not endure conduct that was so severe or pervasive that it altered the terms or conditions of her employment and created a discriminatorily abusive working environment. Flippo admits that she had previously engaged in a sexual relationship with Arruda which was consensual in nature. During the relationship, Arruda suffered from problems with erectile dysfunction on several occasions. She testified that she believed Arruda thought that this was one reason she would no longer go out with him. After the relationship ended, Arruda continued to ask her out. In doing so, she testified that there were occasions when he made reference to the fact that he was now using Viagra, a medicine used to treat erectile dysfunction. While he made a crude comment on one occasion that he could "make that cunt talk back to me," Flippo testified that she did not complain to Taylor about Arruda's comments concerning Viagra because she "felt no need to bring that up." (Flippo Depo. at 373). Furthermore, Flippo testified that Arruda only made a remark about Viagra between two and five times over an 18– to 20–month period that extended from the time she quit dating him to the time she was terminated. (*Id.* at 376). These were the only occasions

when Arruda implied that he would like to have sex with Flippo again. (*Id.*).

Plaintiff also alleges that, after they quit dating, there were a few occasions when Arruda brushed up against her when he was going behind her by squeezing between her and a wall that was behind her while she worked at a cutting table. Plaintiff stated that he was also working at the table and that he could have gone on either side of the table. Thus, she felt it was not necessary for him to squeeze by her when he could have gone around on the other side of the table. (*Id.* at 334–50). Plaintiff initially testified that, on these occasions, he never said anything to her and she never said anything to him. (*Id.* at 347). However, she later stated that she did tell him not to brush up against her and that he responded that he could walk where he wanted to. (*Id.* at 438–39). There is no testimony that Flippo reported these incidents to Taylor.

Thus, the court concludes that the conduct by Arruda was not particularly frequent or severe. Flippo testified that Arruda asked her to go out two or three times a month. While she claims that she complained to Taylor about Arruda about 10 or 15 times, she explained that a number of these complaints were about work-related issues. Furthermore, simply asking plaintiff out on a date, even repeatedly, without more, is not sexual harassment. *Gross–Jones v. Mercy Medical*, 874 F.Supp.2d 1319, 1333 (S.D.Ala.2012). In addition, although Flippo believed that Arruda was making work difficult for her because she would not go out with him, she complained about the resulting work-related issues with Arruda rather than the fact that he was continuing to ask her out. For instance, in the situation outlined above where Flippo went to Taylor because she got in a dispute with Arruda concerning whether he had provided her

with enough pockets to go on a particular set of garments, she never testified that she told Taylor that Arruda's actions were based on her refusal to date him anymore. Likewise, in the situation where Flippo testified that she decided to take some work out of order, resulting in a complaint from Rachel Watson and Arruda, plaintiff did not testify that she told Taylor that this incident was the result of her refusing to date Arruda. In addition, Flippo never testified that she told Taylor that she wanted Taylor to tell Arruda to stop asking her out or take other steps to end this conduct. She admits she never asked to be transferred and never asked Taylor to transfer Arruda somewhere else or terminate him because of his conduct toward her. (*Id.* at 438).

Likewise, Arruda's behavior was not physically threatening, and plaintiff has cited only one instance that would be considered embarrassing or humiliating. She testified that he never threatened her employment if she continued to refuse to go out with him. In addition, this conduct did not affect her work performance. After she quit dating Arruda, Flippo received a raise in pay, at Arruda's suggestion, indicating that her work performance did not suffer as a result of these statements or conduct by Arruda. Further, Taylor made Flippo the lead person in the bundling department because Taylor believed that Flippo knew how to keep the work running smoothly. After considering all of the allegedly sexual remarks and actions by Arruda, the undersigned concludes that this conduct was not sufficiently severe and pervasive to establish that the atmosphere at APS was either objectively or subjectively sexually hostile.

Plaintiff having failed to establish a *prima facie* case of a sexually hostile environment, defendant's motion for summary judgment as to Count One is due to be granted.[2]

### Count Two—Sex Discrimination

▆▆ In Count Two of her complaint, plaintiff alleges that she was discriminated against on the basis of her sex (female) "in regard to training, promotion, job assignments, job pay and terms and conditions of employment, in violation of Title VII." She also states that she has "been discriminated against and harassed because of her sex and has been subjected to unequal treatment. Further the plaintiff has been subjected to a hostile environment because of her gender." (Doc. 1, Complaint, Count Two, at ¶ 39). However, her hostile environment claim has already been addressed with regard to Count One. With regard to the remainder of this claim, there is no evidence in the record that plaintiff was discriminated against on the basis of her sex with regard to her training, promotion, job assignments, pay or other terms and conditions of her employment.

Plaintiff's brief in opposition to summary judgment states that plaintiff "was discriminated against because she was fired for complaining about harassment while Arruda's part was ignored. At a minimum, repeated actions of Arruda asking Flippo out, touching her, cussing her and telling her he could make her cunt talk is sexual harassment" (Doc. 16, Opposition to Summary Judgment, at 23).

As noted above, there is a difference between sexual harassment and gender discrimination. To the extent plaintiff is

---

**2.** Defendants also allege that plaintiff's claim of sexual harassment is untimely. Whether the last act of alleged harassment fell within 180 days prior to the plaintiff filing her EEOC charge of discrimination is unclear from the

evidence presented. Because plaintiff has failed to establish a *prima facie* case of discrimination, it is unnecessary to reach this issue.

complaining of sexual harassment, this claim was addressed in Count One and is, therefore, redundant. Furthermore, with regard to the harassment claim, while plaintiff alleges she complained to Taylor about Arruda asking her out, she testified that she did not tell Taylor about the Viagra-related statements, and there is no testimony that she reported to Taylor anything about being cussed at by Arruda or that he was improperly touching her in any way. In fact, in her testimony about Arruda brushing up against her, Flippo testified only that she felt his hand on her. She did not state that she felt any other body part. Furthermore, she testified that Arruda never improperly touched her on the breasts or between her legs at any time after they quit dating. This leaves only plaintiff's complaints about Arruda asking her out, which are addressed with regard to Count One.

■ With regard to her complaint that she was fired for complaining about Arruda's sexual harassment while nothing happened to him, such a claim sounds more like a claim of retaliation, rather than gender discrimination. Plaintiff's retaliation claim is addressed in Count Four. Nevertheless, to establish a *prima facie* case of discriminatory discharge, Flippo must show that: (1) she was a member of a protected minority; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class. *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Plaintiff is a member of a protected class, female. It is not disputed that she was qualified for her job or that she suffered an adverse employment action. However, there is no evidence that Flippo

was replaced by someone outside her protected class. Thus, she cannot establish the fourth prong based on this factor. Likewise, she cannot show that she was treated less favorably than a similarly-situated person outside her class.

■ In order to determine "whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). "To make a comparison of [her] treatment to that of non-minority employees, [she] must show that [s]he and the employees are similarly situated in all relevant respects." *Id.* Evidence that other employees were guilty of similar misconduct but were not disciplined does not establish that an individual is similarly situated when the party taking the adverse action was unaware of the employees' misconduct. *Jones v. Gerwens*, 874 F.2d 1534, 1541–42 (11th Cir.1989).

According to Flippo's own testimony, she was terminated by Taylor for going directly to a cutter regarding a problem with a cut, rather than going through Arruda or Taylor. (*Id.* at 398–400). She admits that she went directly to the cutter for a re-cut, rather than taking it to Taylor so that she could present it to Arruda. She states that she did this because she did not think asking for a re-cut was an "issue" with Arruda that had to be brought through Taylor. However, she admits that the cutting area was supervised by Arruda. She also admits that Taylor was supposed to contact Arruda about anything that Flippo wanted done in his department. (*Id.* at 421). Flippo testified that Taylor terminated her for insubordination. (*Id.* at 414). She further testified that she has no evidence that Taylor terminated

her because of her sex or any other discriminatory reason. (*Id.* at 421). According to Flippo, whenever she spoke to Taylor about an issue she had with Arruda, Taylor was always understanding and would fully investigate to the extent it needed to be investigated. (*Id.* at 437). She further stated that, until the day she was terminated, except for a requested conference with Roxanne, there was nothing that Taylor failed to do that Flippo asked her to do or that she wanted her to do. (*Id.* at 438–39).

Consequently, plaintiff has failed to establish the fourth prong of a *prima facie* case of gender discrimination against Taylor or APS. Plaintiff has not shown that she was replaced by someone outside her class or that she was treated less favorably than a similarly-situated individual outside her class. Furthermore, while the *McDonnell Douglas* test is not the sole method of establishing a *prima facie* case of discrimination, *see Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1386 (11th Cir.1983), she has failed to present any other evidence that she was discharged because of her sex.

Plaintiff also admits she went directly to the cutter, "Jimmy," for a re-cut rather than taking the issue to Arruda or directly to Taylor. While she did not consider this to be an "issue" that of the sort Taylor wanted brought to her, it is clear that Taylor believed it was. Thus, there is no evidence that the non-discriminatory reason given for plaintiff's discharge was a pretext for discrimination. Therefore, defendant's motion for summary judgment as to Count Two of the complaint is due to be granted.

### Count Four—Retaliation

 Plaintiff's last claim under Title VII is her allegation that she was retaliated against for complaining about discrimination. To establish a *prima facie*

case of retaliation under 42 U.S.C. § 2000e–3(a), a plaintiff must show that (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Wideman v. Wal–Mart Stores*, 141 F.3d 1453, 1454 (11th Cir.1998).

As noted above, the only possible "statutorily protected expression" made by plaintiff to Taylor was her claim that she complained that Arruda continued to ask her out after she quit dating him. She admits that she did not tell Taylor about Arruda's Viagra-related remarks. There is no evidence that she complained about Arruda allegedly staring at her, nor is there any evidence that she complained about his use of vulgar language or that Arruda used any such language outside of the one occasion set out above. Furthermore, plaintiff did not complain that Arruda touched her improperly on the breasts or between the legs and admits that such activity did not occur. Plaintiff also never reported to Taylor that Arruda brushed up against her while walking behind her at the table. Thus, the only possible sexually-related complaint made to Taylor by Flippo is her claim that she told Taylor that Arruda was continuing to ask her out after she had ended their relationship. However, the evidence reflects that Flippo complained about Arruda making work difficult for her, which she believes was based on her refusal to go out with him. She did not testify that she related this belief to Taylor when these work-related issues arose.

 It is a close call as to whether such a complaint is statutorily protected expression. On the one hand, a personal feud is not sex discrimination, even if the parties previously engaged in an intimate sexual relationship. *See Succar v. Dade County Sch. Bd.*, 229 F.3d 1343, 1345 (11th

Cir.2000). However, if continually asking Flippo to continue their relationship is harassment motivated by her refusal to have a sexual relationship with him, Arruda does not get a "free pass" for such conduct simply because he once had a romantic relationship with her. *See Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1188–89 (11th Cir.2001).

■ Even assuming this conduct constitutes protected expression, there must be a casual link between the expression and the adverse employment action. To satisfy the causation requirement, Flippo has to prove "that the protected activity and the adverse action are not completely unrelated." *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir.1998) (internal citations and quotations omitted). *See also Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir.2006). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1119 (11th Cir.2001) (citation omitted). The Supreme Court has stated that "mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be 'very close.' " *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (citations omitted). The Court cited with approval decisions in which a three- to four-month disparity was found to be insufficient to show causal connection. *See id.* (*citing Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir.1997) (three-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir.1992) (four-month period insufficient)). *See also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir.2007) (three- to four-month dis-

parity between the statutorily protected expression and the adverse employment action is not enough).

In response to the question, "What year was it that he mentioned Viagra to you?", plaintiff responded, "It was at the end of the year of 2009 and then in the beginning of the year 2010." (Flippo Depo. at 329). When asked specifically when in 2010 Arruda mentioned Viagra, she responded, "I would say February." (*Id.* at 332). Likewise, she described the incidents of Arruda brushing up against her as occurring in 2010, at the beginning of the year. (*Id.* at 336). It occurred twice the first day. (*Id.* at 348). Approximately a month later, she testified he did it again, testifying that "[h]e probably did that four more times and I started working on the other side of the table." (*Id.* at 349). The only other incidents Flippo could recall involving Arruda that occurred in 2010 were the incident set out above involving Rachel Watson, and the incident set out above when she was struck by a door as he opened it when she went outside the business to take a call on her cell phone, both of which occurred in the summer of 2010. (*Id.* at 334, 360). There is no testimony that Flippo complained to Taylor about any of these specific instances of conduct on the part of Arruda.

Flippo related one incident wherein she had a run-in with Arruda regarding the making of samples for a customer in Massachusetts named Roxanne. This occurred approximately a week before plaintiff was terminated. (*Id.* at 408). However, this incident did not involve Arruda asking plaintiff out on a date. It was a disagreement over what procedure should be followed in manufacturing these samples. (*Id.* at 401–08).

While plaintiff complained that Arruda continued to ask her out "[m]aybe a couple of times, two or three times a month" after

she terminated their relationship, (Flippo Depo. at 314), she was unable to be more specific. (*Id.* at 313–14).

Flippo testified that she went to Taylor with complaints about Arruda 10 to 15 times, including five to six times in 2009. (*Id.* at 315). However, most of these complaints dealt with work-related issues, not complaints about Arruda asking her out. Her testimony was as follows:

Q. And during 2009, how many times did you go to Bonnie Taylor and ask about or say anything about him asking you out, other than this one occasion you have told me about?

Flippo: I would say probably 10 to 15 times I went to her.

Q. In 2009?

Flippo: In 2009?

Q. Yes.

Flippo: Probably five or six times.

Q. And when was that?

Flippo: Every time there would be a problem in the plant and I would have to straighten out work or do something about it or—I would always have to involve Bonnie, always.

Q. I am not talking about disagreements over work issues. I am talking about the asking you out part. And all I am asking is how many times during 2009 did you complain to Bonnie Taylor about him asking you out?

Flippo: I will say a couple of times I went to her and asked for a conference with Roxanne because I had all I could handle of it.

(Flippo Depo. at 315–16).

Flippo testified that the first of these two times that she went to Taylor to complain about Arruda asking her out was in September or October of 2009. (*Id.* at 316). On that occasion, Arruda asked her to go gambling with him and she refused. (*Id.* at 317–18). However, when pressed

for details regarding her complaint to Taylor, she testified that she did not go to Taylor and complain specifically about him asking her out. According to Flippo, when she refused to go out with Arruda, he "would make things hard on [her] work force." (*Id.* at 318). She complained to Taylor about this, rather than the fact that Arruda asked her out. (*Id.* at 318, 321). According to Flippo, she went to Taylor because she did not like Arruda giving her instructions and orders "in a harassing way." (*Id.* at 384).

Although Flippo testified that there were several occasions when Arruda made reference to the fact that he was taking Viagra and that things would be "better" if she were to go out with him again, she further testified that she did not complain to Taylor about these remarks because she "felt no need to bring that up." (*Id.* at 373). Thus, she did not complain about any of the Viagra comments made to her by Arruda, including the one when he made a reference to "cunt." Consequently, there is virtually no evidence that Flippo complained to Taylor specifically regarding the fact that Arruda was continuing to ask her to go out on dates beyond two possible occasions in 2009. Although Flippo testified she believed that Arruda was making her work difficult because she would not go out with him, her complaints to Taylor were with regard to these work-related issues, not specifically that Arruda would not stop asking her out or that she believed the work-related issues with Arruda arose out of any anger toward her for refusing to go out with him. To the extent that she did so, there is no evidence that such complaints occurred at any time temporally close to the time of her termination. Thus, plaintiff has not demonstrated that her termination was temporally close to

any complaint she made about sexual harassment by Arruda to Taylor.

In addition, Flippo testified that she has no evidence that Taylor terminated her because of her sex or any other discriminatory reason. (*Id.* at 421). According to Flippo, whenever she spoke to Taylor about an issue she had with Arruda, Taylor was always understanding and would fully investigate to the extent it needed to be investigated. (*Id.* at 437). She further stated that, until the day she was terminated, except for a requested conference with Roxanne, there was nothing that Taylor failed to do that Flippo asked her to do or that she wanted her to do. (*Id.* at 438–39). According to Flippo's own testimony, she was terminated for insubordination when she went directly to a cutter working under Arruda to get some material re-cut without going through Arruda or bringing the issue to Taylor so that she could take it to Arruda. (*Id.* at 414–418). Consequently, the temporal evidence is weak, at best, and there is no other evidence that Taylor terminated Flippo in retaliation for engaging in statutorily protected expression. Therefore, defendant's motion for summary judgment is due to be granted as to Count Four.

### Counts Three, Five, Six and Seven— State Law Claims

 Plaintiff's only remaining claims are state law claims for negligent hiring, training, supervision and retention, invasion of privacy, assault and battery, and outrage. Plaintiff is an Alabama domiciliary, and defendant Arruda also is an Alabama domiciliary. APS is a Massachusetts corporation, but it is not clear if its principal place of business is in Alabama or elsewhere.[3] Therefore, diversity does not exist on the face of the complaint as to

Arruda. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Thus, there appears to be no basis for original federal jurisdiction over plaintiff's state law claims against defendant Arruda as currently pled. The state law claims previously were before the court properly as supplemental claims supported by plaintiff's federal question claim. *See* 28 U.S.C. § 1367(a). However, with the dismissal of plaintiff's federal claim, there arguably remains no independent original federal jurisdiction to support the court's exercise of supplemental jurisdiction over the state claims against defendant Arruda.

Because it is unclear if APS also may be considered a citizen of the State of Alabama, the court also looks to the complaint to determine whether the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a). In the complaint, plaintiff has not requested a specific sum as damages. Furthermore, it is not readily apparent from the face of the complaint that the amount sought is greater than $75,000. Thus, in order to continue to proceed in federal court by alleging a basis for original jurisdiction, it would be necessary for plaintiff to amend her complaint to allege a basis for diversity jurisdiction. The time for filing amendments to this case has long since passed, although such an amendment still would be allowable with leave of court pursuant to Rule 15(a)(2), Fed.R.Civ.P., if justice so requires. However, for the reasons stated below, it will be recommended that plaintiff's state law claims against Arruda and APS be dismissed without prejudice. Pursuant to 28 U.S.C. § 1367(d), these claims can be refiled in state court and the period of limitations would have been tolled during the time the case was

---

**3.** For purposes of diversity jurisdiction, a corporation is considered to be a citizen of the state in which it is incorporated and the state

in which it has its principal place of business. 28 U.S.C. § 1332(C)(1).

pending in this court and for 30 days after dismissal without prejudice.

■ The dismissal of plaintiff's underlying federal question claim does not deprive the court of supplemental jurisdiction over the remaining state law claims. *See Palmer v. Hospital Auth. of Randolph County,* 22 F.3d 1559, 1568 (11th Cir.1994); *Edwards v. Okaloosa County,* 5 F.3d 1431, 1433–35 (11th Cir.1993). Under 28 U.S.C. § 1367(c), the court has the discretion to decline to exercise supplemental jurisdiction over non-diverse state law claims where the court has dismissed all claims over which it had original jurisdiction, but is not required to dismiss the case. *See Palmer,* 22 F.3d at 1567–68. As the Eleventh Circuit made clear in *Palmer,* once a court decides that it has power to exercise supplemental jurisdiction under § 1367(a), then the court should exercise that jurisdiction, unless § 1367(b) or (c) applies to limit the exercise.

■ Title 28 U.S.C. § 1367 states, in pertinent part:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) . . .

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

In this case, § 1367(c) applies because the court "has dismissed all claims over which it has original jurisdiction," namely, plaintiff's claim against defendant APS under Title VII. *See* 28 U.S.C. § 1367(c). While § 1367(c) permits a court to dismiss any state law claims where the court has dismissed all the claims over which it had original jurisdiction, the court also can consider other factors. Where § 1367(c) applies, considerations of judicial economy, convenience, fairness and comity may influence the court's discretion to exercise supplemental jurisdiction. *See Baggett v. First Nat'l Bank of Gainesville,* 117 F.3d 1342, 1352–53 (11th Cir.1997); *Palmer,* 22 F.3d at 1569; *New England Co. v. Bank of Gwinnett County,* 891 F.Supp. 1569, 1578 (N.D.Ga.1995); *Fallin v. Mindis Metals, Inc.,* 865 F.Supp. 834, 841 (N.D.Ga.1994).

Resolution of plaintiff's state law claims depends on determinations of state law. Plaintiff filed this complaint on October 1, 2012. It appears that a two-year statute of limitations applies to these state law claims. *See Chambless v. Louisiana–Pa-*

*cific Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007) (finding that the statute of limitations for assault and battery and invasion of privacy under *Ala.Code* § 6–2–38(*l*) is two years); *Archie v. Enterprise Hosp. & Nursing Home*, 508 So.2d 693, 695 (Ala. 1987) (two-year statute of limitations applies to outrage claim); *Wright v. Wright*, 654 So.2d 542, 544 (Ala.1995) (indicating that statute of limitations for assault and battery claim governed by *Ala.Code* § 6–2–38(*l*)). However, there is some debate in Alabama as to whether the two-year statute of limitations in *Ala.Code* § 6–2–38(*l*) or the six-year statute of limitations found *Ala.Code* § 6–2–34 applies to claims of assault and battery. *See, e.g., Burroughs v. Smurfit Stone Container Corp., L.P.*, 506 F.Supp.2d 1002, 1021 n. 34 (S.D.Ala.2007) (applying six-year statute of limitations and finding that it "cannot reconcile the seemingly inconsistent cite to *Ala.Code* § 6–2–38(*l*) in *Wright v. Wright*, 654 So.2d 542, 544 (Ala.1995), for support that the statute of limitations had run on the assault and battery claim."). *See also Travis v. Ziter*, 681 So.2d 1348, 1351 n. 1 (Ala.1996) (an action alleging assault and battery must be brought within six years after the accrual of the cause of action pursuant to *Ala.Code* § 6–2–34(1)).

State courts, not federal courts, should be the final arbiters of state law. *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1553 (11th Cir.1992). When coupled with the court's discretion to exercise supplemental jurisdiction under § 1367(c), this court finds that the state law claims remaining in this action are best resolved by the Alabama courts. This is especially true here where the court is dismissing plaintiff's federal law claim prior to trial. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (dismissal of state law claims strongly encouraged when

federal law claims are dismissed prior to trial); *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988) ("When federal law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *Eubanks v. Gerwen*, 40 F.3d 1157 (11th Cir. 1994) (remanding case to district court to dismiss plaintiff's state law claims where court had granted summary judgment on plaintiff's federal law claims). The court finds that judicial economy, fairness, convenience, and comity dictate having these state law claims decided by the state courts.

#### CONCLUSION

Based on the foregoing, it is RECOMMENDED that defendants' motion for summary judgment be GRANTED as to Counts One, Two and Four and that such claims be DISMISSED WITH PREJUDICE. It is further RECOMMENDED that the court DECLINE to exercise supplemental jurisdiction over Counts Three, Five, Six and Seven and that Counts Three, Five, Six and Seven be DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c).

#### NOTICE OF RIGHT TO OBJECT

The parties are DIRECTED to file any objections to this Report and Recommendation within a period of fourteen (14) days from the date of entry. Any objections filed must specifically identify the findings in the magistrate judge's recommendation objected to. Frivolous, conclusive, or general objections will not be considered by the district court.

Failure to file written objections to the proposed findings and recommendations of the magistrate judge's report shall bar the party from a *de novo* determination by the

district court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir. Unit B 1982). *See Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982). *See also Bonner v. Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc* ), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 18th day of April, 2014.